# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
December 20, 2006 Session

## STATE OF TENNESSEE v. JOSHUA EUGENE ANDERSON

**Appeal from the Criminal Court for Knox County**
**No. 79671A     Richard R. Baumgartner, Judge**

---

**No. E2005-02660-CCA-R3-CD - Filed July 6, 2007**

---

A Knox County Criminal Court jury convicted the defendant, Joshua Eugene Anderson, of eight offenses involving victims Sampson Jonathan McGhee ("McGhee") and George England ("England"). The convictions were: (1) first degree premeditated murder of McGhee; (2) felony murder (robbery) of McGhee; (3) felony murder (theft) of McGhee; (4) attempted especially aggravated robbery (by violence) of McGhee; (5) attempted especially aggravated robbery (by putting in fear) of McGhee; (6) attempted first degree murder of England; (7) attempted aggravated robbery (by violence) of England; and (8) attempted aggravated robbery (by putting in fear) of England. The trial court properly merged certain offenses and sentenced the defendant to serve an effective 25- year sentence in the Department of Correction consecutively to the life-without-parole sentence imposed by the jury. The defendant appeals on several grounds, including whether the trial court erred in: (1) failing to suppress the evidence that resulted from the warrantless search of the defendant's home; (2) failing to suppress the defendant's statement to police; (3) denying defendant's motion to dismiss when the State failed to preserve his entire statement; (4) failing to exclude the defendant's recorded statement when the entire statement could not be entered into evidence; (5) denying a new trial due to prosecutorial misconduct; and (6) declining to answer the jury's question regarding the consequences of not reaching a unanimous verdict at sentencing. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and DAVID H. WELLES, J., joined.

Mike Whalen, Knoxville, Tennessee, for the Appellant, Joshua Eugene Anderson.

Robert E. Cooper, Jr., Attorney General & Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Philip H. Morton and Paula Ham, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

The evidence at trial showed that on December 20, 2003, the victims, McGhee and England, who were openly homosexual, left their homes in Sevierville and traveled in a Jeep Cherokee to Knoxville around 1:30 a.m. They patronized Kurt's Bar, a known homosexual establishment. At one point, McGhee informed England that he was going to Rainbow West, another homosexual bar, and left. Approximately one hour later, McGhee returned and informed England that he had met two men, the defendant and Tim Canady, and wanted England to meet them. At approximately 2:45 a.m., McGhee and England left Kurt's in their Jeep Cherokee and drove to West Knoxville News.[1]

Once in the area of West Knoxville News, McGhee pointed out the defendant and Canady's car. McGhee and England followed the car around the block "a couple of times." Then the car went into a nearby graveyard off Sutherland Avenue. England refused to follow the car into the graveyard and drove the Jeep back to West Knoxville News. The defendant and Canady's car pulled into the parking lot, and Canady exited the vehicle and walked to the Jeep's passenger side where McGhee was sitting. England left and went inside West Knoxville News. After approximately 20 minutes, McGhee entered the store and told England that he wanted to follow the defendant and Canady to their house.

McGhee and England then followed the defendant and Canady to the defendant's home at 2813 East 5th Avenue, and England parked the Jeep behind the defendant's car. Inside the house, the defendant and Canady drank alcohol and spoke of how "messed up" they were because they had been drinking alcohol and taking Xanax. After approximately 45 minutes, England informed McGhee that he wanted to leave. However, while Canady was out of the room, the defendant informed England that Canady "really like[d] [him]." Thus, when Canady came back, England asked him if "there [was] a place [they] [could] go to be alone." However, Canady laughed at England, so England and McGhee announced that they were leaving.

As England and McGhee walked toward the door, the defendant pulled a gun and said, "We want your money. We want everything you have. We want everything." England told the defendant that he did not need to do this, and McGhee said as he walked toward the defendant, "'F' this. You're going to have to kill me." McGhee put his hands on the defendant, and the defendant "shoved him off of him." The defendant then shot McGhee twice.

At that point, England grabbed McGhee and ran out the door toward the Jeep. The defendant stood on the porch and shot McGhee again. McGhee fell to one knee, and England helped him across the yard to the passenger side of the Jeep as the defendant continued to shoot. McGhee became unresponsive at this point, and as the defendant walked off the porch toward them, he said, "What do you think of me now, George? How do you like me now, George?"

---

[1]According to the testimony, the streets around West Knoxville News are "cruised" by homosexual men in search of a "hook up."

After England got McGhee into the Jeep and ran back to the driver's side, he discovered that the doors were locked and that the keys were inside. He attempted to get McGhee to let him in, but McGhee's body was limp. When England realized McGhee was dead, he ran because the defendant was pointing the gun at him.

England made his way to a children's runaway shelter, and Sheila Harris, employed by Child and Family Services of Tennessee, came to the door but refused to open it due to the children's safety. She instructed England to lie on the porch, and she called 9-1-1 at approximately 3:55 a.m. As she was speaking to the 9-1-1 dispatcher, the defendant drove very slowly by the shelter a few times. Knoxville Police Officers Robert Taylor and Doyle Lee arrived and placed England in the back of the patrol car while they investigated.

The officers drove to the defendant's home and found the Jeep Cherokee with McGhee's body inside. The back window had been broken out, and the defendant's car, which had been parked in front of the Jeep, was gone. Officers Taylor and Lee called for backup.

In the meantime, the defendant wrecked his vehicle while taking Canady to his house. The defendant was then admitted to the University of Tennessee Medical Center where Nurse Todd Allen attended him. When the defendant was first admitted, Mr. Allen suspected that the defendant was under the influence of a chemical substance. Mr. Allen found a .25 caliber pistol and bullets on the defendant and notified Security Officer James Marshall, who took possession of the weapon and rounds. The defendant was later released to the custody of the Knoxville Police Department after it was determined he was injury free and not intoxicated.

While the defendant was at the hospital, Detective Bryan Davis was investigating the shooting of McGhee and discovered the defendant's involvement; he broadcast the defendant's description and his vehicle's description over the police radio. He then learned that the defendant had been admitted to the hospital and sent officers there to take him into custody. Meanwhile, he prepared a photographic array and interviewed England at the police department and attempted to videotape the interview. England identified the defendant from the array as the shooter.

At approximately 1:00 p.m., officers brought the defendant into the same interview room where Detective Davis had interviewed England. The defendant was "walking fine." Detective Davis attempted to record the interview by placing a videotape into the videocassette recorder and pushing the "record" button; however, the video camera malfunctioned and failed to record. Detective Davis did record the defendant's "final statement" via an audio recorder.

Upon hearing the evidence, the jury convicted the defendant of all charged offenses and sentenced him to life without the possibility of parole for first degree murder. Subsequently, the trial court sentenced him to an effective 25 years to run consecutively to his life sentence. The defendant filed a timely notice of appeal.

On appeal, he raises six issues: whether the trial court erred in (1) failing to suppress the evidence that resulted from the warrantless search of the defendant's home; (2) failing to suppress the defendant's statement to police; (3) denying defendant's motion to dismiss where the State failed to preserve his entire statement; (4) failing to exclude the defendant's recorded statement where the entire statement could not be entered into evidence; (5) denying the defendant a new trial due to prosecutorial misconduct; and (6) declining to answer the jury's question regarding the consequences of not reaching a unanimous verdict at sentencing.

## I. Suppression of Evidence and Motion to Dismiss (Issues (1) through (4))

First, the defendant argues that the trial court erred in failing to suppress evidence that resulted from the warrantless search of the defendant's home. Second, the defendant's issues two through four regard the admission of the defendant's statement to police. We will first address the standard of review on suppression issues and then discuss the issues in turn.

## A. Standard of Review for Motion to Suppress

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; see also Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). We review the issues in the present appeal with these standards in mind.

## B. Warrantless Search of Defendant's Home

At trial, Officer Lee testified that he and Officer Taylor arrived on the scene at 4:20 a.m. Other officers arrived at 4:23 and 4:25 a.m. and attempted to secure the perimeter. Captain Lockmiller arrived at 5:20 a.m., and Detective Davis arrived at 5:40 a.m. Officer Lee further testified that he heard something inside the house and that another officer saw the curtains moving. The officers were unsure of the defendant's and Canady's locations or whether another victim was inside, so Officer Lee received permission from Captain Lockmiller to enter the house and did so through an unlocked window at approximately 5:20 a.m.[2] Officer Lee found two puppies, the apparent sources of the movement and noise, and after securing the house, he opened the front door for the other officers, who collected evidence. Officer Russell Whitfield took pictures of the inside of the house, collected one spent and one live round from a .25 caliber handgun, and retrieved

---

[2]The defendant proffered the incident recall list from the 9-1-1 tape which showed a reported house entry at 6:52 a.m. The trial court commented that even though it was reported at that time, it did not necessarily mean entry actually occurred at that time.

fingerprints from beer and water bottles, ashtrays, and a pack of cigarettes. Ultimately, the photographs, the spent shell, and the bullet were placed into evidence, but the State did not offer any fingerprint evidence. Patricia M. Reside, employed by the Knoxville Police Department in the forensic unit, analyzed the shell casing and determined that it had been fired from the .25 caliber handgun found on the defendant.

Both the United States and Tennessee Constitutions protect against unreasonable searches and seizures. U.S. Const. amend IV; Tenn. Const. art. 1, § 7. A search or seizure conducted without a warrant is presumed unreasonable, thereby requiring the State to prove by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043 (1973); *State v. Simpson*, 968 S.W.2d 776, 780 (Tenn. 1998).

The United States Supreme Court, holding that the constitution prohibits the warrantless entry into a suspect's home to make a felony arrest, has stated that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590, 100 S. Ct. 1371, 1382 (1980). Exigent circumstances exist "(1) when the officers [are] in hot pursuit of a fleeing suspect; (2) when the suspect represent[s] an immediate threat to the arresting officers or the public; and (3) when immediate police action [is] necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." *Jones v. Lewis*, 874 F.2d 1125, 1130 (6th Cir. 1989). In addition, "law enforcement officers may also make a warrantless entry in an emergency to protect human life." *State v. Robbie W. Fields*, No. E2004-00716-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Knoxville, Jan. 7, 2005).

In the present case, the defendant did not raise the issue of suppression of the photographs, the spent shell, and the bullet until the trial was in progress. Specifically, prior to the testimony of Officer Russell Whitfield, the State gave the defense a copy of Officer Whitfield's "nonproperty inventory reports" and "criminalistics report" in an effort to comply in advance with the "*Jencks*" rule. *See* Tenn. R. Crim. P. 26.2(a) ("After a witness other than the defendant has testified on direct examination, the trial court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.") (amended 2006).[3] At this point in the trial, the State had introduced the photographs of the interior of the defendant's house but had not yet introduced the shell casing and bullet. Upon receiving, pursuant to Rule 26.2, the officer's reports and realizing that the State had gleaned evidence from the defendant's home without a warrant, the defense, outside the presence of the jury, moved to suppress the evidence.

---

[3]Amendments to Tennessee Rule of Criminal Procedure 12 that became effective July 1, 2006, made organizational and slight language changes to the subsections cited and quoted above. The language and subsection references used above were applicable to the 2005 trial.

-5-

Nevertheless, a motion to suppress evidence must be filed before trial. Tenn. R. Crim. App. 12(b)(3) ("The following must be raised prior to trial: . . . [m]otions to suppress evidence . . .") (amended 2006). "Failure by a party to raise defenses or objections or to make requests which must be made prior to trial . . . shall constitute waiver thereof, but the court for good cause shown may grant relief from the waiver." Tenn. R. Crim. P. 12(f) (amended 2006). In the present case, the trial court did not determine that the defendant had shown good cause for failing to move to suppress before trial,[4] and we discern no good cause for failing to move to suppress prior to trial. Thus, the issue is waived.

To assist possible further appellate review, however, we mention that England led the police to the scene where the shooting occurred, and the police officers found McGhee's body. The defendant and Canady had not been apprehended, and officers observed movement in the house. The evidence in the record does not preponderate against the trial court's statement that exigent circumstances existed to justify the warrantless entry into the defendant's home.

Of course, however, once Officer Lee determined no suspects were present in the home, the exigency ended. The officers who subsequently entered without a warrant to collect evidence did so in violation of the Fourth Amendment. Nevertheless, because of the inevitable discovery doctrine the evidence was admissible. Under the inevitable discovery doctrine, illegally obtained evidence is admitted by the court when the evidence would have inevitably been discovered by lawful means. *See State v. Patton*, 898 S.W.2d 732, 735 (Tenn. Crim. App. 1994) (citing *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501 (1984)). Here, England informed police officers that the shooting occurred at this house, 2813 East 5th Avenue, and the police found a dead body in the house's driveway. Under these circumstances, the police officers had probable cause to obtain a search warrant.

## C. Defendant's Statement

### 1. Voluntariness of the Defendant's Statement

At the suppression hearing, Detective Davis testified that in investigating the December 20, 2003 homicide, he learned that the defendant was the suspect and that the defendant was being treated at the University of Tennessee Medical Center. After the defendant was discharged from the hospital, Knoxville Police officers brought him to the police department at approximately 1:00 p.m. for questioning. Detective Davis testified that the defendant seemed "calm[] and alert" and that he did not appear to be under the influence of drugs or alcohol.

Detective Davis attempted to videotape the interview; however, the video equipment malfunctioned and did not record the entire interview. Detective Davis did record a portion of the

---

[4]The trial court was abruptly dismissive of the mid-trial claim to suppression, referring to pretrial discovery through which the defense should have known of the warrantless search and seizure, to the failure to file a pretrial motion to suppress, and to the obvious exigent circumstances that authorized entry.

interview via a "backup" audio recorder. He testified that the defendant was upset and "very emotional" during the interview. He did not notice that the video camera did not record until some time after the interview.

On cross-examination, Detective Davis testified that he did not audio-record the entire statement because he assumed that the video camera was recording. He admitted that during the interview the defendant misspelled his own name and gave an incorrect date of birth.

On redirect examination, Detective Davis reiterated that the defendant was able to walk on his own and did not appear to be under the influence of drugs or alcohol. Detective Davis stated that a toxicology report showed that the defendant's blood/alcohol level was .03 percent at 11:40 a.m. and that the blood contained .10 micrograms of Alprazolam per milliliter. Detective Davis interviewed the defendant after 1:00 p.m.

The defendant called Mr. Allen, the nurse from the University of Tennessee Medical Center who treated the defendant. Mr. Allen testified that when the defendant was admitted at 7:50 a.m. December 20, he appeared to be under the influence of something. The defendant could not respond appropriately to questions, his speech was slurred, and he closed his eyes frequently.

On cross-examination, Mr. Allen testified that he found a gun on the defendant and that the defendant's condition improved significantly as time passed. He was discharged according to hospital policy when his blood alcohol level became insignificant.

The defendant testified that on the night of December 19, 2003, and the morning of December 20, 2003, he ingested 20 Xanax pills and drank alcohol. He testified that he did not remember being in an accident, being at the hospital, or giving a statement to police.

On cross-examination, he testified that the last thing he remembered that night was being at a friend's house with Canady.

The trial court first stated, "There are an extraordinary number of cases in which there is a . . . malfunction of the taping equipment at the Knoxville Police Department. . . . At some point that's going to become a real problem." However, the court found that in the present case the defendant was under the influence at the time of the wreck but that his condition improved while at the hospital. The court found that the hospital would not have discharged the defendant had he still been intoxicated and stated that there would have been traces of Xanax in the defendant's system had he taken 20 pills. The court further found that at the police station, the defendant was able to walk properly, follow instructions, and communicate. The defendant gave a voluntary statement after understandingly waiving his *Miranda* rights. Thus, the court denied the motion to suppress.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions,

the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Our supreme court has previously held that "[t]he significant difference between these two provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992).

To be admissible into evidence, the statement must have been given voluntarily by a defendant knowledgeable of his constitutional rights and accompanied by a valid and knowing waiver of those rights. *See State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). The prosecution may not use statements, whether inculpatory or exculpatory, that stem from custodial interrogation unless it demonstrates the use of procedural safeguards that effectively secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966); *Crump*, 834 S.W.2d at 268; *State v. Hicks*, 629 S.W.2d 908, 910 (Tenn. Crim. App. 1981) (defendant's statement given three hours after *Miranda* warnings held to be admissible). In determining whether a defendant has validly waived his *Miranda* rights, courts look to the totality of the circumstances. *Middlebrooks*, 840 S.W.2d at 326. Factors relevant in determining whether a defendant voluntarily made a statement to the police include (1) the length of time between the arrest and the statement; (2) the occurrence of intervening events between the arrest and the confession; (3) the giving of *Miranda* warnings; and (4) the purpose and flagrancy of any official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 2261-62 (1975).

Furthermore, before an accused is entitled to have his statement suppressed because he was under the influence of alcohol or other drugs, the accused must establish that the statement cannot be considered the product of a free mind and rational intellect. *State v. Leonard Lebron Ross*, No. 03C01-9404-CR-00153, slip op. at 7 (Tenn. Crim. App., Knoxville, Apr. 10, 1996); *State v. Larry Thomas Teeters*, No. 02C01-9304-CC-00051, slip op. at 4 (Tenn. Crim. App., Jackson, Feb. 2, 1994); *State v. Michael Abernathy*, No. 03C01-9111-CR-00372, slip op. at 13 (Tenn. Crim. App., Knoxville, Oct. 2, 1992), *perm. app. denied* (Tenn. 1992); *see Bram v. United States*, 168 U.S. 532, 18 S. Ct. 183 (1897); *State v. Robinson*, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980). Generally, if the accused is capable of giving a narrative of past events and relating his role in the commission of the crime, the statement is admissible even though the accused was under the influence of alcohol when he made the statement. *State v. Green*, 613 S.W.2d 229, 232-33 (Tenn. Crim. App. 1980).

We hold that the record supports the trial court's conclusion that the statement was given voluntarily. The evidence showed that the defendant's blood/alcohol level was .03 percent at 11:40 a.m., and he gave his statement after 1:00 p.m. Furthermore, the evidence showed that he was coherent and responded appropriately to questions. The defendant gave a complete narrative of his role in the crimes.

## 2. State's Failure to Preserve Entire Statement

On the day of trial, the defendant moved to dismiss the indictment based upon his being denied access to his entire pretrial statement, claiming that the denial of the statement

prevented effective cross-examination and violated his right to a fair and full trial. The defendant also argued that the denial violated Tennessee Rule of Evidence 106. *See* Tenn. R. Evid. 106.

The trial court stated that it had essentially ruled on this issue at the suppression hearing. The court stated that there was no "conscious design on behalf of the Knoxville Police Department, and specifically Bryan Davis, to defeat this taping." Thus, the trial court denied the motion to dismiss.

On appeal, the defendant raises the same arguments.

First, we address whether the defendant's trial was fundamentally unfair because the State failed to preserve the videotape of the defendant's entire statement. The defendant relies substantially upon *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). In *Ferguson*, officers videotaped the defendant's performance on field sobriety tests administered as part of a driving under the influence investigation; however, the taped tests were inadvertently "taped over" before they were viewed by anyone. *Id*. at 914-15. Our supreme court determined that, for purposes of applying the Tennessee Constitution's "law of the land" clause to issues of the State's losing, damaging, or destroying potentially exculpatory evidence, a balancing test should be utilized. First, as a threshold, the court should "determine whether the State had a duty to preserve the evidence." *Id*. at 916. If the State failed to discharge a duty to preserve evidence, the court then determines

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Id*. at 917.

We hold that the State had no duty to record the defendant's oral statement. Thus, the response to *Ferguson*'s threshold question is peremptory. In *State v. Linda H. Overholt*, No. E2003-01881-CCA-R3-CD (Tenn. Crim. App., Knoxville, Jan. 21, 2005), *perm. app. denied* (Tenn. 2005), the defendant asserted *Ferguson* in claiming that "the trial court erred in admitting into evidence a videotape of a police interview of her on which the audio track malfunctioned for 27 minutes, producing no sound when the tape was played in court." *Id*., slip op. at 7. Commenting that "*Ferguson*'s balancing test need be applied no further" when State had no duty to preserve the evidence, this court declined to grant *Ferguson* relief. *Id*. We distinguished between, on the one hand, the duty to record images or sounds in the first place and, on the other hand, a duty to preserve an existing recording. *Id*. We pointed out that, "at the point in time when the interview was being conducted, the state had no duty to preserve it." *Id*. (citing Tenn. R. Crim. P. 16(a)(1)(A) ("requiring

-9-

state, upon the defendant's request, to furnish the defendant with copies of any written or recorded statement given by the defendant, as well as 'the substance of any oral statement which the state intends to offer in evidence at trial made by the defendant'")); *see Ferguson*, 2 S.W.3d at 917 ("Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tenn[essee] R[ule] Crim[inal] P[rocedure] 16, or other applicable law."). The facts in the present case, in which the video camera failed to record a portion of the defendant's interview, are analogous to *Linda H. Overholt*, which controls. The police officer had no duty to preserve a recording that he never made and had no duty to make.

## 3. Tennessee Rule of Evidence 106

The defendant also argues that the audio taped portion of the defendant's statement should have been excluded pursuant to Tennessee Rule of Evidence 106, which states, "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Tenn. R. Evid. 106. This rule "allows the trier of fact to 'assess related information at the same time rather than piecemeal.'" *State v. Keough*, 18 S.W.3d 175, 182 (Tenn. 2000) (citations omitted). However, this rule, by its own terms, only applies to written or recorded statements or parts thereof. *State v. Wilson*, 164 S.W.3d 355, 365 (Tenn. Crim. App. 2003). A trial court's determination concerning the admission of evidence pursuant to Rule 106 will be reversed on appeal only when there has been an abuse of discretion. *Id*.

Here, the entire *recorded* statement was furnished; thus Rule 106 does not apply to this issue. *See Wilson*, 164 S.W.3d at 365.

## II. Prosecutorial Misconduct

The defendant argues that the trial court erred in not granting a new trial because of prosecutorial misconduct. The specific incidents complained of are as follows: (1) the prosecutor failed to turn over the Investigative Action Report and evidence inventory sheets until mid-trial, preventing the defendant from preparing a defense; (2) the prosecutor mentioned that the defendant was "laughing and joking" as he entered the interview room although the court had previously ruled the information inadmissible; and (3) during closing argument at the first degree murder sentencing hearing, the prosecutor told the jury that the defendant blamed his actions on his drug addiction but that he nevertheless had failed to present an addiction expert.

In reviewing allegations of prosecutorial misconduct, this court determines "whether such conduct could have affected the verdict to the prejudice of the defendant." *State v. Smith*, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990). That analysis involves consideration of five factors: (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the trial court and the prosecution; (3) the intent of the prosecutor in making an improper statement; (4) the cumulative effect of the improper conduct and

any other errors in the record; and (5) the relative strength or weakness of the case. *State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984); *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). A trial court's ruling on the issue of prosecutorial misconduct is reviewed for abuse of discretion. *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1972).

The trial court did not abuse its discretion regarding any of the three incidents. First, the trial court found that the prosecutor lawfully withheld the Investigative Action Report and evidence inventory sheets before releasing them as *Jencks* material. The report was not discoverable. *See* Tenn. R. Crim. P. 16(a)(2). In addition, the discovery response filed in advance of trial inventoried the items recovered after the warrantless entry of the house. Also, the defendant showed no prejudice. Defense counsel had adequate notice to prepare a proper defense, and the evidence of guilt was strong. Thus, we hold there was no prosecutorial misconduct in this regard.

Second, the statement by the prosecutor that the defendant was "laughing and joking" as he entered the interview room was inappropriate considering the trial court's prior ruling; however, it did not amount to prosecutorial misconduct. The statement was made during opening statements, which the jury was instructed were not evidence. In addition, nothing to this effect was entered into evidence during the trial. Most importantly, the defendant failed to show that the statement prejudiced him, and the evidence of his guilt was strong.

Third, the prosecutor commented during closing argument at the sentencing hearing that although the defendant blamed his offense on his drug addiction, he did not present an expert to testify to this addiction. The comment did not shift the burden of proof for a life without parole sentence to the defendant. From the record, we discern that the prosecutor did not intend to shift the burden; he merely commented upon the defendant's conclusory statement and in essence argued that the defendant's excuse was without merit. The trial court did not abuse its discretion in ruling that the statement was not prejudicial.

## III. Trial Court's Answer to Jury Question

At the sentencing hearing on the first degree murder conviction, the jury asked the trial court, "Judge, if we cannot vote unanimously, what?" The trial judge discussed the question with defense counsel and the prosecution, and the trial court told the jury, without objection, that "sometimes you can't agree unanimously. Obviously, it would be our preference that you arrive at a unanimous decision, and – but we understand that sometimes that's not possible." The court further reminded them of the jury instructions and reiterated that the members were "not to surrender [their] honest conviction as to the weight or effect of the evidence merely for the purpose of reaching a verdict."

Because it was approximately 4:41 p.m., the trial court adjourned and told the jury members that they could resume deliberations the next morning. At 10:25 a.m., the jury returned a unanimous verdict that the defendant must serve life without the possibility of parole.

The defendant's argument on appeal is somewhat unclear. Thus, we will address two arguments that he may be offering.

First, the defendant may be arguing that the trial court omitted proper instructions in response to the jury's question. A defendant complaining of an instruction being omitted must make a special request that the instruction be given or otherwise object to the omission, *see* Tenn. R. Crim. P. 30(a), (b); *State v. Cravens*, 764 S.W.2d 754, 757-58 (Tenn. 1989); *State v. Haynes*, 720 S.W.2d 76, 84-85 (Tenn. Crim. App. 1986); *Bolton v. State*, 591 S.W.2d 446 (Tenn. Crim. App. 1979).[5]

Because the defendant failed to make a contemporaneous objection, we will employ the plain error analysis. Before an error is recognized as plain error, it must be "plain" and must affect a "substantial right" of the accused. The term "plain" equates to "clear" or "obvious." *See United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777 (1993). Plain error is not error that is simply conspicuous; rather, it is especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. *See State v. Wooden*, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983).

In *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this court defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense and . . . constitutional in nature." *Id*. at 639. In that case, this court established five factors to be applied in determining whether an error is plain:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused [must not have waived] the issue for tactical reasons; and

(e) consideration of the error must be "necessary to do substantial justice."

*Id*. at 641-42 (footnotes omitted). Our supreme court characterized the *Adkisson* test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error. *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000).

After considering the *Adkisson* factors, we hold that the trial court did not commit plain error because a clear and unequivocal rule of law was not breached. The trial court reiterated

---

[5] No objection or special request for an omitted charge is required when the charge relates to an issue that is "fundamental to the defense and essential to a fair trial." *Poe v. State*, 212 Tenn. 413, 420, 370 S.W.2d 488, 491 (Tenn. 1963); *see also Monts v. State*, 214 Tenn. 171, 379 S.W.2d 34, 40 (Tenn. 1964); *Casey v. State*, 491 S.W.2d 90, 94-95 (Tenn. Crim. App. 1972). The *Poe* exception is inapplicable in the present case, however.

a proper instruction previously given and neither directed comments to the minority nor encouraged any juror to reevaluate his or her position.

Second, the defendant may be claiming that the supplemental instruction given to the jury was error. The instruction "not to surrender . . . honest conviction[s] as to the weight or effect of the evidence merely for the purpose of reaching a verdict" emanates from *Kersey v. State*, 525 S.W.2d 139 (Tenn. 1975). In *Kersey*, our supreme court promulgated the following instruction in lieu of the much maligned "dynamite" charge:

> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.
>
> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

*Id*. at 145. The court indicated that the instruction may be given "as a part of the main charge, [and] it may be repeated should a deadlock develop." *Id*.

We note that the defendant failed to object to the supplemental instruction at the time of sentencing; however, an erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection. *See State v. Lynn*, 924 S.W.2d 892, 898-99 (Tenn. 1996) (citing Tenn. R. Crim. P. 30(b)). Because the defendant raised this issue in his new trial motion, the issue, as a claim of an erroneous charge, is not waived. However, we discern no error in the trial court's supplemental instruction. Pursuant to *Kersey*, the court merely reminded the jury of the instruction that it had already given; no pressure was applied.

## IV. Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-13-