# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 8, 2012

## STATE OF TENNESSEE v. CHRIS CUMMINS

**Direct Appeal from the Circuit Court for Wayne County**
**No. 14895      Robert Holloway, Judge**

---

**No. M2011-02264-CCA-R3-CD - Filed October 22, 2012**

---

The defendant, Chris Cummins, was indicted for first degree murder. The State's proof included the testimony of an inmate who had been housed with the defendant in prison and who claimed the defendant confessed to the crime. The defendant moved for a continuance based on the fact that he was only made aware of this witness on the morning the trial began, and the trial court denied his motion. The jury returned a guilty verdict, and the defendant was sentenced to life in prison. The defendant asserts on appeal that he is entitled to a new trial because the court erred in denying his request for a continuance. After a careful review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR,. and JEFFREY S BIVINS, J.J., joined.

Patrick S. Butler, Waynesboro, Tennessee, for the appellant, Chris Cummins.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Mike Bottoms, District Attorney General; and Doug Dicus and Brent Cooper, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The victim, Buddy Griggs, was the ex-boyfriend of the defendant's wife, Krystal Cummins. The victim and Ms. Cummins had two young children together. The victim disappeared from his mother's home on April 17, 2010, and his remains were found approximately one month later, after the historic flood of May 2010, in a wooded area. Although both the defendant and Ms. Cummins initially denied any involvement with the victim's death, Ms. Cummins, after giving numerous contradictory statements to the police,

implicated the defendant and led police to the victim's remains.

Ms. Cummins testified at trial that the defendant was jealous of her relationship with the victim. According to Ms. Cummins, she had decided to leave the defendant because he manufactured methamphetamine. Ms. Cummins testified she brought the victim to the house where she and the defendant lived because she needed to retrieve her diaper bag prior to leaving the defendant. She unexpectedly found the defendant at home. Ms. Cummins testified that there was no immediate hostility between the victim and the defendant and that the three adults spent time playing with the children. According to Ms. Cummins, the victim had put his two-year-old daughter on the hood of a van and was engaged in making sure she did not fall off when the defendant unexpectedly struck him from behind on the right side of the head with a sleeve cut from a thermal shirt, filled with rocks, and secured at either end. Ms. Cummins testified that the defendant then choked the victim with a wire cut from an exercise machine and fitted with homemade handles which she had noticed in his pocket earlier. The defendant wrapped the victim in plastic and placed him in the trunk of the car. The defendant and Ms. Cummins then drove the car with the children inside to the victim's mother's house and left the children there. Ms. Cummins also testified that they stopped by a gas station. After driving various places in an attempt to hide the body and making a few more stops, the defendant rolled the victim down a ridge. The defendant then burned various items which might have had physical evidence on them.

The defendant gave a statement in which he denied any knowledge of the victim's death. However, after he was informed that Ms. Cummins, in one of her statements, had told the police that he and the victim had been fighting and he killed the victim, the defendant gave a second statement which blamed Ms. Cummins for the victim's death. In this statement, he asserted that Ms. Cummins had told him the victim attempted to rape her and she hit him with a rock and choked him with some wire, then put him in the trunk of the car. The defendant stated that Ms. Cummins removed the body from the trunk at their home and wanted to burn the body, but he would not let her. He stated that she put the victim's body back in the trunk and left briefly and that he thought she had removed the body from the trunk. They then took the children to the victim's mother's house, went by the gas station, and drove various places. He stated that he did not realize the victim was still in the car until Ms. Cummins expressed a desire to go down a road to dump the body. When they got home, they burned some wood, but he would not let her burn the body at their home. He stated that he did not know when the body was removed from the trunk and that Ms. Cummins had burned several items.

On the Friday afternoon prior to trial, the prosecutor was told that an inmate had some information regarding the defendant's case. The prosecutor interviewed the inmate, then communicated with others in the District Attorney General's office. The prosecutor was not

able to "fully interview" the witness until the morning of the first day of trial, and the decision was made then to use the inmate's testimony at trial. Although the inmate testified at trial that he had told the administrator of the jail that he knew something about the defendant's case in January, approximately four months prior to the trial in late May, the prosecutor stated to the trial court that, while he was aware that the inmate had information regarding a different case, he was not aware that the inmate had any information regarding the defendant's case until the Friday before trial.

The defendant moved for a continuance. At this time, the prosecutor revealed the substance of the witness's expected testimony. The trial court denied the continuance but allowed defense counsel to interview the inmate; the inmate refused to speak with defense counsel. The prosecution provided defense counsel with the inmate's criminal record for the purpose of impeachment. The inmate testified at trial that the defendant had told him and Steven Beersdorf – who was also incarcerated and who was trying to silence a prisoner who planned to testify against him – that the defendant had killed before and was not scared to do it again. The inmate testified that the defendant then privately told him that he had killed the victim with a sock full of rocks and strangled him with a wire, and that he did it so that the victim would not take the kids away because the kids "would get checks" until they turned eighteen. The defendant later, according to the inmate, showed him the photographs of the victim's remains and pointed out a fracture that he said was caused by hitting the victim with the rocks. On cross-examination, the inmate testified that at one point the defendant had animosity towards him because the inmate had called a guard to assist another prisoner who had a seizure while the defendant and another man were "smacking" him for being a child molester. According to the inmate, the defendant showed him the pictures of the victim's remains in order to frighten him. Jeremy Holt testified on behalf of the defendant that he had been incarcerated with the inmate witness and that the inmate told him that someone wanted the inmate to testify against the defendant. Mr. Holt testified that the inmate was trying to get information about the case against the defendant. The trial court allowed defense counsel to interview Mr. Beersdorf, who was allegedly present when the defendant confessed to having killed someone. Although the record shows that the defendant called Mr. Beersdorf and that Mr. Beersdorf testified, the record is missing the volume in which Mr. Beersdorf's testimony is recorded.

Numerous witnesses testified for the State and the defendant. A videotape from Ms. Cummins's stop at the gas station showed the defendant using the windshield cleaner to clean the bumper of the car, and medical testimony established that the victim's skeletal remains had sustained some trauma to the right side of the head which likely was not the result of scavenger activity. The victim's blood was found in the trunk of the car the defendant and Ms. Cummins had used that day. The defendant had attended church the following day and broke down crying at church. The State put on proof that the defendant had cut the victim's

picture out of a photo album, and Ms. Cummins's mother testified that the defendant wouldn't let her speak with Ms. Cummins unless she was on speaker phone and that she had seen Ms. Cummins with bruises. The defense put on proof that Ms. Cummins had, in a conversation with an inmate who was housed with her in prison, confessed to killing someone and that she told the victim's aunt by telephone that she had killed the victim. The defense proof also included evidence that Ms. Cummins had choked a woman with whom she was fighting and that she had thrown a boiling teapot at the victim's head. The jury convicted the defendant of first degree murder.

**Analysis**

The defendant contends that he is entitled to a new trial because the trial court erred in denying his request for a continuance. The denial of a continuance falls within the discretion of the trial court, and the trial court's decision will not be overturned absent a clear showing of abuse of discretion to the prejudice of the defendant. *State v. Wilson*, 164 S.W.3d 355, 362 (Tenn. Crim. App. 2003). Tennessee Code Annotated section 40-17-106 states:

> It is the duty of the district attorney general to endorse on each indictment or presentment, at the term at which the indictment or presentment is found, the names of the witnesses as the district attorney general intends shall be summoned in the cause, and sign each indictment or presentment name thereto.

The prosecution's failure to include a witness in the indictment does not automatically entitle a defendant to relief, however. This statute is merely directory, and a witness whose name is omitted from the indictment is not necessarily disqualified from testifying, *State v. Hutchison*, 898 S.W.2d 161, 170 (Tenn. 1994). The purpose of the statute is to prevent the defense from being surprised by evidence at trial. *State v. Kilpatrick*, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000). The defendant is therefore not entitled to relief unless he can demonstrate prejudice. *Hutchison*, 898 S.W.2d at 170. The relevant prejudice is not that resulting from the testimony offered at trial but any prejudice that results from the defendant's lack of notice regarding the witness's appearance. *Wilson*, 164 S.W.3d at 362.

The defendant contends that he was prejudiced by his inability to investigate (1) the inmate's familiarity with the case, including any interaction with friends of the victim who could have informed the inmate about the details of the case; (2) biases the inmate may have had against the defendant; (3) the inmate's reputation for truthfulness in his community; (4) whether the inmate, Mr. Beersdorf, and the defendant were actually housed together at the time of the alleged conversation; and (5) an "infinite number of leads" derived from the above investigations. He also argues that he was unable to effectively cross-examine the

witness. Prejudice is usually established at a proceeding subsequent to trial. *State v. Morris*, 750 S.W.2d 746, 749 (Tenn. Crim. App. 1987). The defendant's assertions that he was prejudiced by inadequate time to investigate the inmate's claims are speculative and conclusory. The defendant has failed to make any concrete showing of prejudice. The inmate refused to speak with defense counsel, and there is no reason to think delay would have changed his mind. The defense has pointed to no evidence which could have been used to undermine the inmate's testimony had it come to light prior to trial. In this case, there was "no showing in post-trial proceedings that had the defendant had more time he could have impeached or refuted the testimony of the witness[]." *State v. Underwood*, 669 S.W.2d 700, 703 (Tenn. Crim. App. 1984).

Furthermore, the defendant has shown "[n]o prejudice, bad faith, or undue advantage" on the part of the State. *State v. Harris*, 839 S.W.2d 54, 69 (Tenn. 1992). Although the inmate testified that he had informed an administrator at the prison regarding his testimony approximately four months before the trial, it appears that the prosecution was not actually aware of the inmate's claims until the Friday before trial, and the prosecution did not have the opportunity to fully interview him and evaluate his potential as a witness until the day of trial, when it promptly informed the defendant that the witness would be called. The defendant has not shown that the State acted in bad faith or obtained an undue advantage. *See Underwood*, 669 S.W.2d at 703 ("Although an officer apparently had known of these witnesses for a considerable length of time, for various reasons, the district attorney general had not.").

The prosecution provided the defense with the witness's criminal history to aid in cross-examination, and the witness was thoroughly cross-examined. The trial court extended the trial for an extra day in order to allow the defense to call Mr. Beersdorf to testify. The defendant also used the testimony of Mr. Holt to impeach the inmate's claims that the defendant had confessed. In similar circumstances, we have held that the trial court did not abuse its discretion in denying a continuance. *See Hutchison*, 898 S.W.2d at 170-171 (finding no prejudice when the defendant was notified of previously unavailable witness on first day of trial, the State provided the defendant with the witness's criminal record, and defense counsel interviewed and cross-examined the witness); *Harris*, 839 S.W.2d 69 (denying relief where the witness came to light four days prior to trial, the defendant was notified, and the defendant had the opportunity to cross-examine the witness and to discredit the witness by calling the witness's mother to testify); *Kilpatrick*, 52 S.W.3d at 87 (denying relief because "nothing would have been gained by the defense had the trial been continued to a later date" and because defendant should have known witnesses would testify regarding the chain of custody); *State v. Gilbert*, 612 S.W.2d 188, 191 (Tenn. Crim. App. 1980) (holding that a witness was properly allowed to testify although the prosecution only discovered the witness on the morning of trial, when the testimony was duplicative and when

-5-

there was no indication that the witness's testimony "would have been different if defense counsel had been permitted to interview him earlier"). We conclude that the trial court did not err.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE