IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 15, 2014

**STATE OF TENNESSEE v. TOMMY DALE ADAMS**

**Appeal from the Criminal Court for Wilson County**
**No. 2009CR681     David Earl Durham, Judge**

_____

**No. M2013-01080-CCA-R3-CD - Filed July 21, 2014**

_____

A Wilson County Jury convicted Defendant, Tommy Dale Adams, of first-degree felony murder, second-degree murder, and especially aggravated robbery. He received concurrent sentences of life for first degree felony murder, twenty years for second degree murder, and twenty years for especially aggravated robbery. On appeal, Defendant argues: (1) that the trial court erred in admitting a photograph into evidence after finding that its probative value outweighed its prejudicial effect; (2) that the trial court erred in excluding testimony by Dewy Raymond, finding that it was inadmissible hearsay; and (3) that the evidence was insufficient to support his convictions for first degree felony murder, second degree murder, and especially aggravated robbery. After a thorough review, we remand the matter to the trial court for entry of a corrected judgment to reflect that the convictions of felony murder and second degree murder are merged into one count of felony murder. In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Vacated in Part; and Remanded for Entry of a Corrected Judgment**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROBERT W. WEDEMEYER, J., joined.

Tillman W. Payne, Nashville, Tennessee, for the appellant, Tommy Dale Adams.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Bradshaw, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; Laura Bush, Assistant District Attorney General; for the appellee, the State of Tennessee.

**OPINION**

## I. Background

In October of 2009, Eddie Good was living at 155 Knights Creek in Statesville, Tennessee. He and the victim, Darrell Sloan were good friends. On Friday, October 2, 2009, the victim called Mr. Good because he wanted to be out in "the country for the weekend." Mr. Good invited the victim to his house, and the victim arrived at approximately 6:00 p.m. and spent the night at the residence.

Mr. Good testified that on the following day, Saturday, October 3, 2009, at approximately 3:00 p.m. he and the victim began drinking beer. That night, Mr. Good had a bonfire and invited others to join him and the victim. At approximately 7:00 p.m., Mr. Good's date, Jody Hayes, arrived at the house, and Mr. Good's neighbors, Steve and Betty arrived at approximately 8:00 p.m. Mr. Good testified that Defendant, Derrick Blair, Chris Estes, and Chris Cozart showed up at the bonfire uninvited at approximately 9:30 p.m. Mr. Good noted that he had spoken with Mr. Blair by phone earlier in the evening and that he owed Mr. Blair twenty-five dollars for some Adderall. Mr. Good had told Mr. Blair that he had fifteen dollars of the money owed and would place it in Mr. Good's mailbox for Mr. Blair to pick up. Mr. Good testified that he had seen Defendant and Mr. Estes three times in the past year, and he had never met Mr. Cozart. He did not expect the three men to accompany Mr. Blair to pick up the money.

Mr. Good and Ms. Hayes were sitting around the bonfire when Defendant, Mr. Blair, Mr. Estes, and Mr. Cozart arrived. The victim, Steve, and Betty were inside the house playing pool at the time. Mr. Good testified that at approximately 11:00 p.m., he walked into the house and saw that the victim was passed out in a chair in the "pool room." The chair was located at the far end of the right side wall. There was a window on the same wall to the right of the door. Defendant was also in the room at the time. He then informed everyone in the room that the party needed to end. Mr. Good noted that he (Mr. Good) had a "good buzz" from drinking beer, smoking a marijuana joint, taking two shots of whiskey, and consuming a hydrocodone pill.

After Steve and Betty left the residence, Defendant, Mr. Blair, Mr. Estes, and Mr. Cozart left in a truck. As they sped down the "S"-shaped driveway, they crashed the truck into a tree line and got "hung up." Mr. Good testified that the men asked to use his truck, which was smaller, to pull out their truck. Mr. Good allowed them to use his truck but it was unable to pull out the other truck. The men then asked to use Ms. Hayes' truck, but she refused. Mr. Good testified that he allowed Mr. Estes to drive his truck to go pick up a larger truck. Mr. Cozart rode with Mr. Estes.

Mr. Good testified that the men did not return his truck, and he recalled a conversation with Mr. Blair about the keys to the vehicle. He did not recall getting upset about the men using his truck. However, Mr. Good noted that he sometimes had blackouts. Mr. Good next remembered "coming to" and sitting in a chair by the bonfire warming his hands. He said that no one else was around, and the house was "totally dark." Mr. Good testified:

> Nobody was - - there was nothing going on, and I looked and I saw my gun out and I didn't - - I was like, why is my gun out, why is my gun out. Within like ten minutes of me just sitting there, a vehicle comes up the driveway, a truck, turns around and stops. It turns around and stopped. There's a sidewalk right here. Three individuals got out, started walking. One stopped right over here by my AC and started looking through the window. The other two went on the porch there. One of them started looking through the kitchen window and one looked through the - - or just looking through the door itself.

> \*     \*     \*

> When they started looking suspicious, I grabbed my gun and I hollered, hey, what are you doing, or something to that - - well, they started running, so I fired two rounds in the air. The smallest of the three fired back at me. More than likely it was a .22 because, you know, it didn't sound that loud.

Mr. Good testified that he fired one more round before the three individuals got into a light-colored full size truck and drove away.

Mr. Good testified that after the men left, he walked into the house and put the rifle in a closet in the hallway. He then walked into the bedroom, opened the windows, got his shotgun, sat down on the bed, and fell asleep. Mr. Good woke up the following morning at approximately 8:00 a.m. He walked through the house and to the pool room where he discovered the victim's body. Mr. Good was extremely upset and called his mother who called 911. Mr. Good indicated that he was "messed up that morning" because it "was not a good thing to see" such a good friend in that manner. He waited on the porch until police arrived. He spoke with investigators and members of the Tennessee Bureau of Investigation (TBI). During an interview with investigators, Mr. Good realized that his truck had not been returned. It was found approximately one week later in a creek bed. Mr. Good "ended up scrapping" the vehicle. Mr. Good testified that he also had a scuff mark across his face where it appeared that someone had hit him with something. He did not recall getting into a fight.

Jody Hayes testified that she arrived at Mr. Good's house at approximately 7:00 p.m. on October 3, 2009. Mr. Good and the victim were the only people at the residence at the time. Betty and Steve arrived approximately one hour later. Ms. Hayes testified that someone named Katie was also at the residence for approximately twenty minutes, and then she left. Ms. Hayes said that everyone was around the bonfire when a truck pulled up at approximately 9:00 p.m. with four men inside. Ms. Hayes did not know any of the men. She heard one of the men say, "put that away" but she did not turn around to see what the man was talking about.

Ms. Hayes testified that there were introductions, and everyone except for her and Mr. Good went inside the house. She thought that the others remained inside the house for approximately two hours. Ms. Hayes testified that she and Mr. Good were drinking, and Mr. Good did not appear to be overly intoxicated. Ms. Hayes testified that at some point Mr. Good walked into the house and asked everyone to leave. She said, "Steve and Betty left first, then the four boys left. One of them left first and then two of them came running out of the house, and the third [sic] one after that."

Ms. Hayes testified that after the four men left, two of them later walked back to the house and said that they had gotten their truck stuck "in a creek or ditch or something at the end of the driveway, and could [Mr. Good] give them a hand." She said that the two men asked to use her truck but she refused. They then asked to use Mr. Good's truck, and he gave them the keys. Ms. Hayes testified that she and Mr. Good walked into the house to change the music, and she saw the victim asleep in a chair. She "wiggled" the victim to see if he would wake up and move to a bed but the victim did not move. Ms. Hayes and Mr. Good changed the music and walked back outside. After approximately five to ten minutes, Mr. Good decided to walk to the end of the driveway and check on the four men. Ms. Hayes remained by the bonfire. She then decided that it was getting late and that she needed to leave. Ms. Hayes walked back inside the house to retrieve her CDs and CD case. She attempted to wake the victim again but he still did not move. Ms. Hayes testified that she took her CDs and got into her truck to leave. She said that the radio was still playing in the house when she left, and she did not turn off any lights.

Ms. Hayes drove to the end of the driveway and saw the truck that was stuck, and she saw Mr. Good's truck over to the side of the driveway. Ms. Hayes stopped and attempted to assist the men by shining her headlights into the area. Two of the men again asked if they could use her truck, and she refused. Mr. Good then allowed two of the men to drive his truck to get a four-wheel drive vehicle to pull out the truck that was stuck. Ms. Hayes testified that it was midnight when she finally left Mr. Good's residence. She did not notice Mr. Good being upset at any time while she was with him. Ms. Hayes testified that Mr.

-4-

Good called her the following day at approximately 2:00 to 3:00 p.m. He did not tell her that the victim had been killed.

On October 3, 2009, Chris Cozart drove his truck to Defendant's house. He had known Defendant for approximately three weeks at the time. Chris Estes was also at the residence when he arrived. Mr. Cozart had known Mr. Estes since high school. After being at Defendant's residence for approximately thirty minutes to an hour, Mr. Cozart, Mr. Estes, and Defendant traveled to the S&S Market in Mr. Estes' truck and purchased a case of beer. At some point, the three men picked up Derrick Blair at his grandmother's house, and they drove to a liquor store in Lebanon and purchased a bottle of George Dickel whiskey. Mr. Cozart testified that he saw Defendant, Mr. Estes, and Mr. Blair smoking marijuana at Defendant's house.

Mr. Cozart testified that he, Defendant, Mr. Estes, and Mr. Blair rode around for a while and then drove to Mr. Good's house because Mr. Blair indicated that Mr. Good owed him some money. They got the money out of Mr. Good's mailbox and then decided to drive up to Mr. Good's house because he was having a party. Mr. Cozart testified that he did not know anyone else at the party and that Mr. Good and a woman were standing around the bonfire. Mr. Cozart and the other three men then walked inside Mr. Good's house. He remembered the victim and another woman inside the house. The victim was playing pool at the time. Mr. Cozart testified that he was in the house for approximately one hour before Mr. Good walked inside and asked everyone to leave. When Mr. Cozart left, he saw the victim sitting in a chair in the corner of the room. He said that the victim was awake and alert.

Mr. Cozart testified that when he, Mr. Estes, Mr. Blair, and Defendant left Mr. Good's residence, Mr. Estes was speeding down the driveway and slid his truck into some trees. They attempted to pull the truck out with Mr. Good's truck but were unsuccessful. Mr. Cozart and Mr. Estes then decided to drive Mr. Good's truck to Defendant's house to pick up Mr. Cozart's four-wheel drive truck. Mr. Estes was driving Mr. Good's truck and drove too fast around a sharp curve and hit an embankment, wrecking Mr. Good's truck. Mr. Cozart "collided with the dash" and rolled out of the vehicle into the middle of the road. Mr. Cozart thought that Mr. Estes broke his nose. Mr. Cozart testified that he was not in good shape after the accident. He said, "I mean, I was alert and everything but it was just adrenalin, plus with the alcohol and everything mixed up, I was in almost shock, I would say." Mr. Cozart testified that Mr. Estes was in slightly better condition, "but obviously still not that great." He and Mr. Estes did not attempt to move Mr. Good's truck after the accident because it "was sitting up on the bank."

Mr. Cozart testified that he and Mr. Estes walked to Defendant's house to get Mr. Cozart's truck. Mr. Cozart did not have a clear recollection of what happened after he and Mr. Estes arrived back at Defendant's house. He recalled getting into his truck with Mr. Estes, and Mr. Estes drove back to Mr. Good's house and pulled Mr. Estes' truck out of the trees. Mr. Cozart remembered riding in his truck with Mr. Estes back to Defendant's house, and Defendant and Mr. Blair rode in Mr. Estes' truck. After the men arrived back at Defendant's house, Mr. Cozart fell asleep on the couch. He next remembered waking up to find dried blood on his face. Mr. Cozart saw Defendant, Mr. Estes, and Mr. Blair asleep near him. He did not see any weapons. Mr. Cozart woke Mr. Estes and asked for his keys, and Mr. Estes informed him that his (Mr. Cozart's) truck was "messed up." Mr. Cozart's truck had fresh dents, blue paint on the bumper, and a blown-out tire. He then drove the vehicle to Ronnie Taylor's house, and they changed the tire.

Derrick Blair testified that he pled guilty to second degree murder and aggravated robbery of the victim. His testimony concerning the events of October 3, 2009, was similar to that of Mr. Cozart. Mr. Blair testified that while at Defendant's house, he drank beer, smoked marijuana, and took Xanax. He said that after Mr. Estes wrecked his own truck leaving Mr. Good's house, Mr. Good approached him and Defendant and began screaming that Mr. Estes had stolen Mr. Good's truck. Mr. Good also threatened to kill them but he did not have a weapon at the time. Mr. Blair testified that he and Defendant then ran to Greenville Road where they saw Mr. Estes and Mr. Cozart in Mr. Cozart's truck. Defendant and Mr. Blair got into the truck, and the four men returned to Mr. Good's house, and pulled Mr. Estes' truck out of the trees. The four men drove back to Defendant's house where they continued drinking alcohol and "smoking weed."

Mr. Blair testified that Defendant later indicated that he wanted to return to Mr. Good's house to "kick his ass cause [sic] he was threatening to kill us." Mr. Blair said that Mr. Cozart was passed out at Defendant's house and that Mr. Blair, Defendant, and Mr. Estes drove back to Mr. Good's house in Defendant's car. There was a .410 shotgun and a .22 caliber pistol in the car that Defendant had brought from his house. Mr. Blair testified that when the men arrived at Mr. Good's house, Defendant got out of the car with the shotgun and fired a shot into the air while he was running toward the back door of Mr. Good's house. He then reloaded the weapon. Mr. Blair testified that Mr. Estes was carrying the .22 pistol. He said that Defendant ran into the house, and Mr. Blair went to the back window. Mr. Blair testified that Mr. Estes shot through the back door of the house twice and then handed the gun to Mr. Blair who shot through the window four times.

Mr. Blair testified that when Defendant first ran into the pool room he turned to the right and fired a shot. He said that he saw the victim leaning over the pool table with blood on him. Mr. Blair testified that when Defendant came back out of the house "he just opened

the screen door and stuck the gun in there and shot again." Mr. Blair said that the shot hit the victim. Mr. Blair testified that he entered the room and saw the victim lying on the floor. He then removed the victim's wallet from his pocket ripping the victim's pants. Defendant, Mr. Estes, and Mr. Blair went through the house looking for Mr. Good, but they did not find him. Mr. Blair flipped through the victim's wallet and then gave it to Defendant and Mr. Estes when he got back into the vehicle with them. Mr. Blair said that when he got into the car, the shotgun was in the front, and he had the .22 pistol in his waistband. Mr. Blair testified that the only thing discussed during the ride back to Defendant's house was "[j]ust don't nobody tell what happened."

Mr. Blair testified that after the three men arrived back at Defendant's house, the victim's wallet was thrown into a fire. He did not know what happened to the money that was in the wallet. Mr. Blair, Defendant, and Mr. Estes continued drinking, "snorted a couple more Xanax pills and smoked some more marijuana." Mr. Blair testified that at some point after the shooting, he, Defendant, and Mr. Estes used Mr. Cozart's truck to pull Mr. Good's truck from the embankment. They pulled the truck to Defendant's house and placed it in a creek behind Defendant's house.

Mr. Blair testified that he, Defendant, and Mr. Estes returned to Mr. Good's house a third time in Mr. Cozart's truck. Mr. Estes was driving at the time. Mr. Blair testified that they went back to the house because Defendant said that they needed to find Mr. Good. Mr. Blair still had the pistol in his waistband, and the shotgun was lying on the dashboard of the truck. Mr. Blair testified that as they were walking down the sidewalk at Mr. Good's house, "someone hollered from toward the bonfire, you know what happened, get the F [sic] out of here, and started shooting at us." Mr. Blair could not identify the person. He said that he fired back at the individual with the .22 pistol. Mr. Blair testified that he, Defendant, and Mr. Estes then left the residence, and Mr. Estes drove them back to Defendant's house. Mr. Cozart's truck had a flat tire from the shooting. Mr. Blair then walked into the house and passed out. He still had the .22 pistol at the time.

Mr. Blair testified that before Mr. Estes took him home the following morning, he told Mr. Blair "don't nobody tell nothing." Mr. Blair spoke with investigators sometime early the next morning. He also spoke with them on multiple other occasions and provided inconsistent statements. The last time he spoke with investigators he told them the truth about what happened. Mr. Blair was certain that Defendant shot the victim. He also noted that he had previously stolen the .22 pistol from Defendant who later bought it back from the person that Mr. Blair sold it to.

Chris Estes testified that he was also charged with first-degree felony murder, second-degree murder, and especially aggravated robbery of the victim. He did not testify in

exchange for any agreement with the State. Mr. Estes' testimony about the events leading up to the shooting were similar to that of Mr. Cozart and Mr. Blair. Mr. Estes testified that the first time that he, Defendant, Mr. Blair, and Mr. Cozart arrived at Mr. Good's house, they went inside, and Mr. Estes saw the victim asleep in a chair in the corner of the pool room. The men remained inside the house for approximately one hour drinking whiskey before Mr. Good walked in and asked everyone to leave. Mr. Estes thought that Mr. Good wanted to "get frisky" with his date.

Mr. Estes acknowledged that he wrecked his truck in Mr. Good's driveway because he was driving too fast and that he and Mr. Cozart eventually left in Mr. Good's truck to drive to Defendant's house and pick up Mr. Cozart's four-wheel drive vehicle to pull out Mr. Estes' truck. Mr. Estes confirmed that he was driving too fast to Defendant's house and also wrecked Mr. Good's truck. He said that Mr. Cozart hit the windshield and "busted his face up pretty good." Mr. Estes testified that he hit the steering wheel and his nose bled a little. He helped Mr. Cozart clean his face, which had been bleeding, and they walked to Defendant's house and picked up Mr. Cozart's truck. Mr. Estes then drove the truck to his mother's house to get a spare tire for his truck and a pair of jumper cables. Mr. Estes testified that he and Mr. Cozart drove back to Mr. Good's house and that as they pulled in, Defendant and Mr. Blair came running onto Knights Creek Road and "told us that we had to get out of there. We couldn't go back up there." Defendant told Mr. Estes that Mr. Good had threatened him because Mr. Estes had not brought Mr. Good's truck back.

Mr. Estes testified that he then pulled his truck from Mr. Good's driveway to Knights Creek Road and Greenville Road. Mr. Estes got out of Mr. Cozart's truck and unhooked the chain to his truck. Defendant then left in Mr. Estes' truck with the tire still flat. Mr. Cozart and Mr. Blair got into the truck with Mr. Estes, and they drove to Defendant's house. Once they arrived at Defendant's house, Mr. Cozart walked inside and passed out. Mr. Estes remained outside for fifteen to twenty minutes working on his truck. He then walked inside and sat on the couch. Defendant and Mr. Blair were still outside talking. Mr. Estes testified that he dozed off to sleep for approximately five to ten minutes. He was awakened by Mr. Blair who pulled on his leg and told him to wake up. Mr. Estes testified that he was very intoxicated at that point, "to the passing out point." He then put his boots on and saw Defendant walking out of his bedroom carrying "stuff in his hands, and he went out the back door and [Mr. Blair] went out behind him."

Mr. Estes testified that when he got into the car with Defendant, he saw a sawed off .410 shotgun and a "pistol, revolver." He said that both of the guns belonged to Defendant, and he had previously seen both of the weapons at Defendant's house. Mr. Estes testified that he rode in the front passenger seat by Defendant and that Defendant had the shotgun "stuck in down between the seat in his car." He said that Mr. Blair had the .22 caliber pistol

in the back seat.  Mr. Estes testified that Mr. Blair told him that they were going back to Mr. Good's house to "rob them."  He said that when they arrived at Mr. Good's house, Defendant pulled around  behind the house and parked the car approximately five to six feet from the house.  Concerning the shooting, Mr. Estes testified:

> They said, let's get out.  Everybody got out.  And [Defendant] and [Mr. Blair] ran over to the house, the side where the pool room is.  [Defendant] ran to the door and [Mr. Blair] ran to the window right there that looks into the pool room.

> \*　　　\*　　　\*

> When they got out they ran up to the pool room, [Defendant] to the door, [Mr. Blair] to the window, and [Defendant] went right inside the pool room and fired the .410 shotgun toward where [the victim] was sitting earlier when we was there, and then ran back out of the pool room.  [Defendant and Mr. Blair] communicated.  I couldn't hear what they were saying but they was communicating back and forth.

> \*　　　\*　　　\*

> . . . I seen a shadow like someone getting up in the pool room, and that's when [Mr. Blair] fired the pistol through the window four times, and then I seen [the victim] walk over - - real slow, walk over to the door and look out, and when he looked out he turned around and slid down the door there, and that's when [Defendant]  opened the door and put the gun in there and leaned back out and pulled the trigger and shot.

Mr. Estes testified that after the first shot was fired, he heard the victim "moaning in pain like he had got hurt, like he'd been hurt from the first shot."  Mr. Estes said that he never went into the house to see what was in the pool room.  He said that after the last shot, Defendant and Mr. Blair ran back into the house, and he could see Mr. Blair leaning over where the victim was lying in the floor.  Mr. Estes testified that after a few minutes, Defendant and Mr. Blair ran back out of the house and all three men got into the car.  He said that Mr. Blair then indicated that they needed to find Mr. Good, and Defendant agreed.  Mr. Estes testified that Defendant and Mr. Blair exited the car and ran back into the house.  They came back out of the house, ran toward a shed, and then got back into the car.  Mr. Blair still had the .22 pistol, and Defendant placed the shotgun "back down in between the seats like it was on the way over there."  He  noted that Mr. Blair passed a wallet to Defendant when they got into the car.

Mr. Estes testified that on the way back to Defendant's house, Defendant "said that everybody needed to keep their mouth shut because he said he'd kill us if we said - - if we told on him, threatened us." Mr. Estes testified that Mr. Blair agreed with Defendant, and Mr. Estes said, "all right." When the three men arrived back at Defendant's house, they got out of the car, and Defendant asked Mr. Estes to hand him the pistol that was lying on the floorboard. Mr. Estes did not know where Mr. Blair went. Mr. Estes then walked inside the house to check on Mr. Cozart who was still asleep on the couch. Mr. Estes testified that Defendant and Mr. Blair discussed building a fire, but Mr. Estes never saw one.

Mr. Estes testified that at some point, he was sitting on the couch, and he heard Mr. Blair, who was in the next room with Defendant, ask "how much was it or something." Mr. Estes testified that he had been sitting on the couch for approximately ten to fifteen minutes when Defendant told him that they needed to go and get Mr. Good's wrecked truck because of what had happened and that Mr. Estes' fingerprints would be in the vehicle. Mr. Estes testified that Defendant said that "if I didn't want to go to jail we needed to get rid of the truck. So I agreed to go get the truck out of the ditch." He said that they used Mr. Cozart's truck to pull Mr. Good's truck out. Mr. Blair was in the truck with him. Mr. Estes testified that they towed Mr. Good's truck back to Defendant's house and then used Mr. Cozart's truck to push it into creek behind Defendant's house in order to conceal it.

After Mr. Estes and Mr. Blair drove back to Defendant's house from the creek, Defendant walked out the back door with the shotgun and the pistol. He told them that they needed to go back to Mr. Good's house and find him. Mr. Estes testified that he drove Defendant and Mr. Blair back to Mr. Good's house in Mr. Cozart's truck. Defendant had the shotgun, and Mr. Blair had the .22 pistol. Mr. Estes testified:

> I drove back over to [Mr. Good's] house, pulled all the way up in the driveway behind the house. I turned around, and as I turned around, I ran over a TV that was laying in his yard and the tire started going flat. [Mr. Blair and Defendant] got out of the truck and went running back towards the back doors of the house. I heard someone yell, saying, you all need to get out of here, get out of here, and I heard two sharp loud rifle shots, and three sharp pistol sounds and a .410 blast. And they got back in the truck and we got out of there real quick and left.

Mr. Estes testified that the first shots fired came from Mr. Good in the area of the bonfire. He said that the other two shots fired came from Defendant and Mr. Blair.

Mr. Estes testified that they left Mr. Good's house and drove back to Defendant's house. Mr. Estes went in the back door, sat on the couch, and went to sleep. It was

approximately 4:30 a.m. when Defendant went into the house and into his bedroom. Mr. Estes testified that he slept for approximately one hour, and Mr. Cozart woke him up asking for his truck keys. He gave Mr. Cozart the keys and told Mr. Cozart that his truck had a flat tire. When Mr. Cozart asked what happened to the truck, Mr. Estes said, "I told him that he was drunk and got up in the middle of the night and drove around in his truck and then he c[a]me back." Mr. Cozart then left Defendant's house.

Mr. Estes testified he and Mr. Blair changed the flat tire on Mr. Estes' truck, and Mr. Estes drove to his mother's house to change vehicles. He then drove Mr. Blair to Mr. Blair's grandmother's house. Mr. Estes testified that he drove back to Defendant's house and asked him "what happened" and "why." Defendant told Mr. Estes to "just keep your mouth shut and it will be all right." Mr. Estes then left and drove home.

Mr. Estes testified that he first spoke to police on Sunday night, October 4, 2009. He spoke with Detective Ricky Knight and Captain Terry Davis. Mr. Estes gave them a statement. He told them that he went to Mr. Good's house with Defendant to pick up Mr. Blair. Mr. Estes also stated that he wrecked his truck there, pulled it out, and went home. The following day, he spoke with a TBI agent and a detective. Mr. Estes gave them further information but still did not tell them everything. Mr. Estes again spoke with investigators two days later, on a Wednesday, and told them everything that happened. He told them who fired the shotgun and who fired the pistol. Mr. Estes testified that he never had the pistol while he was at Mr. Good's house. He said that his fingerprints would be on the weapon because he touched the end of the barrel when he handed it from the back seat to Defendant.

Deputy Scott Filson of the Wilson County Sheriff's Department testified that he arrived at Mr. Good's house at 9:20 a.m. on October 4, 2009. He found Mr. Good sitting on the porch and spoke with him. Mr. Good's mother also arrived at the house. Mr. Good indicated that the victim was deceased inside the house, and no one else was there. Deputy Filson secured the scene and waited for Sergeant Kyle Wright to arrive. He noted that the victim's body was located in the pool room. Deputy Filson also called for Detective Jeff Johnson and the Sheriff to come to the scene. Detective Ricky Knight also arrived at the house. Deputy Filson turned the scene over to Detective Johnson.

Detective Jeff Johnson testified that he arrived at Mr. Good's house at approximately 10:30 a.m. He met with Deputy Filson and Sergeant Wright who pointed him to the victim's body and some other pieces of evidence that had been discovered. Detective Johnson located, marked, photographed, and numbered the evidence which included: spent .410 shotgun shells outside the pool room door; wadding from .410 shotgun shells in the backyard and inside the pool room; the fire pit; three spent .22 caliber shell casings near the fire pit; different angles of the victim lying on the floor next to the wall in the pool room; the pool room chair where

the victim had been sitting; blood on the pool table; the pool room layout; the victim's ripped out rear pants pocket; and the victim's injuries showing blood spatter. Detective Johnson testified that Mr. Good had "superficial scratches" to his face but he did not recall seeing any blood on Mr. Good's face. He did not photograph the scratches. Detective Johnson submitted a total of seven pieces of evidence to the TBI for testing which included: two spent .410 shotgun shells; shotgun shell wadding; a small piece of cotton type material; and three spent .22 caliber shell casings. Detective Johnson also removed a .22 caliber rifle from Mr. Good's closet. He noted that because the sheriff's office was short several detectives at the time, the TBI crime lab was called in to process the remainder of the crime scene.

Special Agent Chet Mason of the TBI testified that he assisted in the investigation of the victim's death. He arrived at Mr. Good's house at approximately 3:00 p.m. on October 4, 2009. Special Agent Mason spoke with Mr. Good and determined that Mr. Blair was a potential suspect. He spoke with Jody Britt and Katie Myles and then interviewed Mr. Blair the following morning on October 5, 2009, at the home of Mr. Blair's grandmother. Mr. Blair showed Special Agent Mason the pair of jeans that he had been wearing the night of the murder, which appeared to have blood on them. After Special Agent Mason confronted Mr. Blair about the blood, Mr. Blair confessed to being a party to the victim's murder, and he implicated Defendant and Mr. Estes.

Using information obtained from Mr. Blair, Special Agent Mason obtained a search warrant for Defendant's residence. Although Defendant was not home at the time, the warrant was executed on October 5, 2009. Special Agent Mason participated in the search. He noted that a spent .410 shotgun shell was found near the front sidewalk, and two pieces of shotgun wadding were found "to the right front yard to the right of the residence." Inside the residence, two unfired .410 shotgun shells were found underneath the couch.

Special Agent Mason testified that Defendant was later located on Salem Road in his vehicle and transported to the residence. The vehicle was seized and towed to Defendant's house as well. Special Agent Mason advised Defendant of his rights, and Defendant signed a waiver form. Special Agent Mason and Special Agent Wayne Jackson returned to Defendant's residence on October 7, 2009, because Agent Mason had learned that there may have been some items burned at Defendant's residence. Defendant was at home at the time and signed a "TBI waiver of constitutional rights to a search warrant."

Special Agent Mason discovered and photographed a fire pit, and he discovered several pieces of partially-burned paper which included the victim's voter registration card and Delta Dental insurance card; four .410 shotgun shell brass caps; four .22 caliber shell casings; and three shotgun pellets. Defendant then provided Special Agent Mason with a statement concerning his involvement in the offenses. The statement contained the following:

-12-

I was born here in Nashville, Tennessee, but grew up in Sullivan, Illinois. The last grade I completed in high school was the ninth grade. On Saturday, October 3, 2009, I was here at my house with JJ. I think his real name is Jeremiah Bennett. Chris Estes pulled up in his tan Ford F-150 truck. Me and Chris went to Dutton's Market to get beer and cigarettes. We rode around drinking beer for a bit and came back here and smoked a joint. Another guy by the name of Chris, I don't know his last name, showed up. He drives a blue Chevy 1500. Me, Chris, and Chris went to S&S Market to get more beer. On the way back, Derrick Blair sent me a text message and we went by his grandmother's house and picked him up. We came back here after we picked him up. We left my house to go to Eddie's house so Derrick could get some money that Eddie owed him. We go over to Eddie's for about forty five minutes to an hour. Eddie, some long haired guy, some black headed guy, and some chick were all at Eddie's. As we were leaving, Chris Estes wrecks his truck into some trees at Eddie's house. Chris and Chris take Eddie's truck to my house to get Chris['] truck to get Chris Estes['] truck unstuck. Me and Eddie were sitting on the tailgate of Chris Estes['] truck and Derrick was walking around. Eddie starts to get upset because his truck isn't back and says he's going to get his gun and that we need to be gone by the time he gets back. Me and Derrick run through the woods and meet up with Chris Estes and the other Chris in the other Chris' blue truck. We pulled Chris Estes' truck out with the other Chris' truck and brought them both back to my house. We messed around with Chris Estes' truck for a while. The other Chris was asleep on my couch. We left my house to go get Eddie's truck that Chris Estes and the other Chris had wrecked earlier that night. We brought Eddie's truck over here to my house and drove it down into the creek to the right of my house. After that we - - me, Chris and Derrick, went inside and smoked a joint. The three of us decided to take my car back to Eddie's house to look for my cell phone and to pick up pieces of Chris Estes' truck. We left Eddie's and came back to my house. Me, Chris Estes and Derrick went to look through Eddie's truck in the creek. We come back inside and drink more beer and talked. I laid down in the floor and went to sleep. I forgot to mention that after we picked up Derrick we went to the liquor store off Sparta Pike and got a bottle of dark liquor. I would be willing to take a lie detector test. At one time I owned a .410 sawed-off single shot shotgun and a .22 caliber revolver pistol. Derrick Blair stole the pistol from my house about four months ago. I bought it back from a woman named Vicki. About three weeks ago, the shotgun, the pistol, a box of bullets for each and two ounces of weed were stolen from my house. I had shot both the .22 pistol and the .410 shotgun into a trailer to the right of my house. I would like to add that when I woke up Sunday, October 4, 2009,

-13-

at about 11:30 a.m., Chris Estes and Derrick were already up and the other Chris was already gone. A guy by the name of Neil was pulling out of my driveway in a white four door diesel truck. I have no explanation as to why the victim's, Darrell Sloan's insurance card is in the fire pit beside my house. I have burned spent shell casings in my fire pit before which would explain why there are brass shotgun shell casings and .22 caliber brass spent rounds in my fire. The last time I burned stuff in my fire pit was about two or three weeks ago.

Special Agent Mason testified that he was later called to the Medical Examiner's Office to pick up a "blood spot of the victim's as well as his clothing." He took the items to the TBI crime lab for additional testing. Special Agent Mason acknowledged that he took multiple statements from Chris Estes and Derrick Blair. He said that their final statements were consistent with the other facts and evidence. Special Agent Mason testified that he reviewed phone records from Mr. Good and Mr. Blair. He noted that a phone call was placed at approximately 12:18 a.m. on October 4, 2009, from Mr. Good to Mr. Blair that lasted approximately two seconds.

Lieutenant Ricky Knight with the Wilson County Sheriff's Department assisted Detective Johnson at Mr. Good's house on October 4, 2009, and he assisted with the search of Defendant's house. Lieutenant Knight testified that he received the names of some individuals that had been at Mr. Good's house on the night of the shooting. He knew two of the people, Chris Estes and Derrick Blair. He began looking for Mr. Blair with whom he had past dealings. He noted that he had been able to talk with Mr. Blair, and he felt that Mr. Blair would tell him what happened.

Lieutenant Knight testified that he and Captain Terry Davis first located Mr. Estes at approximately 8:00 p.m. on October 4, 2009, at his grandmother's house. Lieutenant Knight and Captain Davis then continued looking for Mr. Blair. Lieutenant Knight testified that he, Special Agent Mason, and Detective B.J. Stafford found Mr. Blair early the following morning at his grandmother's house. Mr. Blair directed them to a camper behind the house where they recovered the clothing that he had been wearing the night of the shooting. There were some stains on the clothing that appeared to be blood. While they were in the camper, Mr. Blair gave a statement to Special Agent Mason. Concerning the statement, Lieutenant Knight testified:

Most of the time they don't tell you everything right at the first initial interview. You'll interview them and then that will lead you somewhere else and you might go interview them and uncover more information. You'll have to go

back to the first person you talked to and then, you know, uncover some more information from them.

Lieutenant Knight testified that while he was at the search of Defendant's house, he was notified that Defendant's vehicle had been spotted on Cainsville Road, and there had been a traffic stop of the vehicle on Salem Road. Lieutenant Knight responded to the area and saw Defendant in the back of a patrol car when he arrived. Defendant was transported to his residence, and his vehicle was towed there. Lieutenant Knight followed them back to the residence. He later had Defendant's vehicle towed to the Sheriff's Department Impound Lot and secured inside the building. Lieutenant Knight testified that Eddie Good's truck was located in a creek behind Defendant's house.

Dr. John Brently Davis, a forensic pathologist and employee of Forensic Medical Management Services in Nashville, performed an autopsy on the victim on October 5, 2009. He testified that the victim had the following injuries:

> There were two shotgun wounds to his head; one that involved his left ear, and the second was right below that and behind the left ear. Additionally, there were more shotgun pellet injuries involving the left upper arm, the left side of his chest and his right hand.

Dr. Davis noted that the shotgun wound to the victim's left ear was a contact wound. Concerning contact wounds, Dr. Davis testified:

> A contact wound is when the muzzle of the weapon is pushed against the skin, and on a hard target like the head it leaves - - we have not just wounds from the pellet but from the escaping gases. So when the gasses escape, go underneath the skin, stretch and expand the skin and then lacerates. So you typically won't see just a round wound. You'll see adjacent tearing of the skin called lacerations associated with the escape of the gasses.
>
> And also at the edge of that wound you'll see soot. You can see soot and stippling and that can help us determine the range of the weapon. This was a very characteristic contact range to the left side of his head with soot in the wound from the - - that escapes with the pellets and the lacerations is caused by the gases.

Dr. Davis testified that the shotgun wound behind the victim's left ear was a close range wound. He said that the damage cause to the victim by the shotgun wounds "was a devastating injury causing massive injuries to multiple aspects of his brain and skull and his

right eye." Dr. Davis removed numerous small shotgun pellets and "two white plastic wads" from the victim's brain. He noted that the victim also had numerous small individual pellet wounds to his left upper arm extending down a little below his elbow, the left side of his chest, and his right hand. The victim had three broken fingers in his right hand from the pellets. Dr. Davis testified that the cause of the victim's death was multiple shotgun wounds to the head and that the manner of death was homicide.

Special Agent Shelly Betts of the TBI Crime Lab, Firearms Identification Unit, testified that she responded to the scene on October 4, 2009. At the time, she was the leader of the Violent Crime Response Team which was requested to process the scene. Special Agent Betts created a diagram of the house and pool room using measurements, sketches, photographs, and a video from the scene.

Special Agent Betts testified that there was a seven-inch shot pellet pattern present on a screen door leading into the pool room. There was no glass covering the screen. On the opposite wall from the door, she found a shot pellet pattern that indicated the pellets went through the screen door and hit the back wall. Special Agent Betts later examined the screen further at the crime laboratory and determined that there were four bullet holes in the screen window with vaporous lead residue indicating that a firearm had been discharged less than 36 inches from the screen. Special Agent Betts also found four .22 caliber bullet holes in the wall across from the window. She concluded that the bullets hit the wall sideways after striking an intermediate target. Special Agent Betts testified that the holes in the wall corresponded with the holes in the screen.

Special Agent Betts testified that there was a rocking chair in the corner of the room that contained a fired shotgun shell wad. She explained that a "shot wad is a plastic piece that holds all of the pellets inside of a cup. The shot wad is designed to reduce the recoil of the shotgun." There was also a small amount of blood on the chair. Concerning evidence that was collected at the scene, Special Agent Betts testified:

> We collected samples of the blood stain. We collected a tire impression that was found outside in front of the house. Some portions of the wall that had - - the portion of the wall with the shot pattern. Also some of the portions that had bullet holes or suspected bullet holes in it. We collected some cigarette butts to test for DNA. We collected numerous items for fingerprint processing. We collected - - actually recovered bullets from - - one from the opposite wall of the window [.22 caliber copper coated lead bullets] and then some bullets from the room behind this room.

> \*       \*       \*

-16-

We also collected some reference ammunition from - - one room had a weight bench in it so we called that the weight room, and also from the master bedroom, those are .22 caliber, and collected those to see if the evidence bullets or the bullets recovered from the walls were the same type and design.

Special Agent Betts testified that she tested the items collected by her team and those submitted by Special Agent Chet Mason and Detective Jeff Johnson. She examined the victim's clothing and discovered shot patterns in his sweatshirt and t-shirt. Special Agent Betts concluded that, at a minimum, the victim experienced a close contact shotgun blast around his left shoulder area and that he had been shot once around the elbow. She testified that the shotgun shell wadding recovered from Mr. Good's back yard, the wadding found in the rocking chair, the wadding recovered from the floor of the pool room, the wadding recovered from Defendant's residence,  and two unfired "shot shells" recovered from Defendant's residence were ".410 gauge consistent with Winchester manufacturer." They were all of the same type and design.

A Winchester .410 gauge shotgun shell case was also recovered from Defendant's house and four shotgun shell casings were found that contained only the brass cups, and it appeared that they had been burned in a fire. Special Agent Betts testified that all of the shotgun shell casings recovered from Mr. Good's backyard and all but one of the casings found at Defendant's residence had been fired from the same shotgun. He noted that one of the shell casings was "missing a primer."

Concerning the weapons involved in the case, Special Agent Betts testified:

There's a .410 gauge shotgun and a .22 caliber - - .22 long rifle caliber firearm. That could have been a .22 caliber pistol. It could have been a .22 caliber revolver, or it could have been a .22 caliber rifle. There are two different .22 caliber firearms involved. One was a .22 caliber rifle collected at the crime scene. There were cartridge cases at the crime scene that matched those, and then there were unknown cartridge cases recovered from [Defendant's] residence that did match that rifle. So there are actually two .22 caliber firearms involved.

Lauralee Staples, a former agent with the TBI Serology DNA Unit, testified that she processed Defendant's vehicle, a black 1995 Buick Regal, on October 20, 2009. She discovered the victim's driver's license lying on the back seat floorboard of the vehicle. Mr. Staples also discovered stains on the steering wheel that she confirmed was blood.

Patrick Ihrie, a former agent with the TBI Serology DNA Unit, testified that he compared the swab of the bloodstain from the steering wheel of Defendant's car to the victim's DNA sample. He concluded that the blood from the steering wheel matched the victim's DNA.

## II. Analysis

### A. *Admissibility of Evidence*

The admissibility of evidence is generally within the sound discretion of the trial court. *State v. Saylor,* 117 S.W.3d 239, 247 (Tenn. 2003). The threshold determination is whether or not the proffered evidence is relevant. Pursuant to Rule 401 of the Tennessee Rules of Evidence, evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *State v. Forbes,* 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). Even relevant evidence, however, may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "When arriving at a determination to admit or exclude even that evidence which is considered relevant, trial courts are generally accorded a wide degree of latitude and will only be overturned on appeal when there is a showing of abuse of discretion." *Saylor,* 117 S.W.3d at 247. Although standing alone, a particular piece of evidence may be of questionable relevance, the evidence may still be admissible if it becomes relevant when taken in connection with other evidence. *State v. Ivey,* 360 S.W.2d 1, 4 (1962). In addition, it is not enough for the State "'merely to show that [a fact] may have been, but [the State] must go further and furnish some logical basis for the inference that it was or is.'" *Id.,* 360 S.W.2d at 5 (citation omitted).

First, Defendant argues that the trial court erred in admitting into evidence Exhibit 29 which was a photograph of the victim's shotgun wound injuries. He contends that the evidence was not relevant and that its "particularly graphic" nature was unfairly prejudicial.

The admissibility of photographs lies within the sound discretion of the trial court whose ruling will not be overturned on appeal except upon a clear showing of an abuse of discretion. *State v. Banks,* 564 S.W.2d 947, 949 (Tenn. 1978); *State v. Lacy,* 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997). Nevertheless, the photograph must be relevant to an issue at trial with its probative value outweighing any prejudicial effect that it may have upon the trier of fact. *State v. Braden,* 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993).

The leading case regarding the admissibility of photographs is *State v. Banks,* 564 S.W.2d 947 (Tenn. 1978), in which the supreme court held that the admissibility of photographs of murder victims is within the discretion of the trial court after considering the relevance, probative value, and potential unfair prejudicial effect of such evidence. Generally, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *Id*. at 950-51. The probative value of the evidence must be weighed against any unfair prejudice the defendant will suffer in admitting the evidence, and only if the unfair prejudice substantially outweighs the probative value may the evidence be excluded. *Id*. at 951.

As discussed above, evidence is relevant when it has any tendency to establish a fact, bearing on the outcome of the action, as more or less probable than without that evidence. Tenn. R. Evid. 401. Specifically, evidence can be relevant if it aids the testimony of an investigative officer or medical examiner. *See State v. Bush,* 942 S.W.2d 489, 515 (Tenn. 1997). In the present case, the photograph was introduced as an exhibit to Detective Johnson's testimony to show blood spatter.

During Detective Johnson's testimony, defense counsel objected to the admission of the photograph noting that it was "just too graphic, not necessary." He also argued that other photographs could be used. The prosecutor argued that the photograph was being introduced for the "purpose of showing the blood spatter, the direction of the shot, where it came from, the shot in the shoulder and where it goes through the head. [I] think it explains the testimony." Concerning this issue the trial court found:

> This Court does find that it does have probative value, particularly showing the direction of the shot and the closeness of the shot, because I do understand blood spatter evidence. I also find further that its probative value is not outweighed by its prejudicial effect, so I'm going to overrule your objection.

The trial court further made the following findings at the hearing on Defendant's motion for new trial:

> And then talking about Exhibit Number 29, which I have gone back and reviewed. You know, in my thirty plus years in the business, I have seen the most horrible photographs. Things that would make Stephen King recoil in horror. Exhibit 29 is not one of those photographs.
>
> When you look at that particular rule, when you look at the law, it's not whether the photograph or the probative value is outweighed by the danger of unfair

prejudice. You've got to look at that word, and this is a word that so many people overlook. It says, must be substantially outweighed.

In this particular case Photograph 29 just does not do that. It does tend to give the jury relevant evidence, evidence which is necessary to help explain the other testimony that was given. Not, is it rather gross, pictures of any dead body can be rather gross. But does it reach that level that the probative value is substantially outweighed by the danger of unfair prejudice. Photograph 29 doesn't do that. That was my ruling then. I've gone back and looked and it's my ruling now. So that issue is without merit.

There were other photographs from the crime scene depicting the victim's wounds, admitted into evidence without any objection by defense counsel. While the crime scene photograph in question does show the victim's body in a bloody condition, we agree with the trial court that this photograph is not particularly gruesome and its probative value outweighs any prejudicial effect. A contested issue at trial was the Defendant's identity as the perpetrator. The photograph was relevant to corroborate witnesses' testimony. This issue is without merit.

Next, Defendant contends that the trial court erred in excluding testimony by Dewy Raymond on the basis that it was inadmissible hearsay. Defendant asserts that the testimony was being offered for impeachment and not offered for the truth of the matter asserted. He contends that the testimony demonstrated a prior inconsistent statement by Mr. Estes who had testified during the trial that he did not fire a weapon at Mr. Good's house and that he was merely a passenger in the car when the shooting occurred and did not know what was going on.

In a bench conference, prior to Mr. Raymond's testimony, the following exchange took place:

[Defense Counsel]: Your Honor, we would call Mr. Dewey Raymond.

[The Prosecutor]: Your Honor, we're going to have to have a jury out hearing or we can approach up there.

THE COURT: You all come on up.

\* \* \*

THE COURT: Yes, sir.

-20-

[The Prosecutor]: Your Honor, we need to have a jury out. He's going to talk about something he says that Chris Estes said in jail and its -

THE COURT: Well, if it's hearsay it doesn't come in.

[Defense Counsel]: No, he said it to him.

[The Prosecutor]: He said it to him.

THE COURT: I'm sorry, hold it. Is the question going to be - are you going to ask the witness what a person outside this courtroom said? If you do that's hearsay unless you can give me an exception.

[Defense Counsel]: He's an accomplice.

THE COURT: It doesn't matter. The only way it comes in is if it's a statement made during the course of a conspiracy. Once he's in jail, that conspiracy is over. It has to be a statement made during the course of the conspiracy unless you can find another hearsay exception. I'll give you an opportunity to do that, but once you're in jail, that conspiracy is over.

\* \* \*

THE COURT: The law is it's hearsay unless you find me an exception. Do you have an exception, [Defense Counsel]?

[Defense Counsel]: I do not at this time, Your Honor.

THE COURT: You can put him on the stand and ask the question, but upon objection, I'm going to sustain it and you might as well not put him on unless it falls under the exception of the hearsay rule, he doesn't testify.

[Defense Counsel]: Your Honor, I believe that Mr Estes, when he testified -

THE COURT: It doesn't matter.

-21-

[Defense Counsel]:  Well in rebuttal -

THE COURT:  Unless there's a hearsay exception, [Defense Counsel]-

[Defense Counsel]:  I think if it's used as a way to impeach Mr. Estes' testimony.

THE COURT:  No, sir.  Impeachment doesn't go under the hearsay rule. Look at Rule 803 and 804, and unless you can find me an exception, it doesn't come in.  An accomplice and coconspiritor testimony only comes in through the course of the conspiracy.  Once it's over, no longer admissible. I'll give you a moment to check your rules.

Thereafter, defense counsel did not cite to any rule or authority that would allow the admission of the out-of-court testimony.  The trial court then allowed an offer of proof in a jury-out hearing during which Mr. Raymond testified concerning the statement by Mr. Estes. The State objected but defense counsel did not assert that the statement was not being offered for the truth asserted.  The following exchange then took place at the jury out hearing:

[Defense Counsel]:  Mr. Raymond, are you - do you know [the victim]?

[Mr. Raymond]:  A little bit.

[Defense Counsel]:  Do you know the parties involved; [the defendant], Derrick Blair and Chris Estes?

[Mr. Raymond]:  Yes.

[Defense Counsel]:  Did Chris [Estes] ever make a threat to you?

[Mr. Raymond]:  Yes sir.

[Defense Counsel]:  In making that threat what did he tell you?

[Mr. Raymond]:  That he was going to kill me like he did [the victim].

[The Prosecutor]:  The State objects to that as being hearsay.

THE COURT:  Sustained.  You may be excused, sir.  Thank you.

[Defense Counsel]:   Thank you, Your Honor.

The Tennessee Rules of Evidence provide that "[h]earsay is not admissible except as provided by these rules or otherwise by law."  Tenn.  Evid. 802. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c).  "If an out-of-court statement is not offered to prove the truth of the matter asserted, such as a statement offered for impeachment purposes, it is not hearsay." *State v. Wilson*, 164 S.W.3d 355, 364 (Tenn. Crim. App. 2010).

Tennessee Rule of Evidence 613, sets out the procedure for utilizing the prior statement of a witness for impeachment purposes.  Impeachment evidence, like any evidence, must be relevant in order to be admitted into evidence.  *State v. Leach,* 148 S.W.3d 42, 56 (Tenn. 2004).

The rules of evidence limit the introduction into evidence of prior inconsistent statements of witnesses. Tennessee Rule of Evidence 613(b) provides:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 803(1.2).

*See also State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982).  Tennessee Rule of Evidence 613(b) allows the introduction of otherwise inadmissible extrinsic evidence for impeachment. *State v. Martin,* 964 S.W.2d 564, 567 (Tenn. 1998); *see also State v. Smith,* 24 S.W.3d 274, 280-81 (Tenn. 2000).  A prior inconsistent statement introduced for purposes of impeachment may be considered only on the issue of credibility and not as substantive evidence.  *Reece,* 637 S.W.2d at 861.  When presented with a prior inconsistent statement a "witness has several possible responses: the witness can admit, deny, or not remember making all or part of the statements."  Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, *Tennessee Law of Evidence* § 613[5][a] (5th ed. 2005).  If the witness admits making the prior inconsistent statement, any extrinsic proof of the statement would be cumulative and therefore inadmissible. *Id*.

With regard to the alleged statement by Mr. Estes, he was never questioned about the statement during his testimony as required by Rule 613(b). Tenn. R. Evid. 613(b) ("[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible *unless and until the witness is afforded an opportunity to explain or deny the same* and the opposite party is

-23-

afforded an opportunity to interrogate the witness thereon . . . .") (emphasis added). Therefore, a proper foundation for admission of a prior inconsistent statement was not laid. Defendant is not entitled to relief on this issue.

### B. Sufficiency of the Evidence

Defendant contends that the evidence is not sufficient to support his convictions for first degree felony murder, second degree murder, and especially aggravated robbery. Specifically, Defendant contends that the verdicts were against the weight of the evidence and that he was convicted on uncorroborated testimony of accomplices. We disagree.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes,* 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris,* 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle,* 639 S.W .2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R.App. P. 13(e); *Harris,* 839 S .W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan,* 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett,* 788 S.W.2d 559, 561 (Tenn. 1990).

It is true that convictions may not be based solely upon the uncorroborated testimony of accomplices. *See State v. Robinson,* 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997). However, Tennessee law requires only a modicum of evidence in order to sufficiently corroborate such testimony. *See State v. Copeland,* 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984). More specifically, precedent provides that:

The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must[,] of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.

*State v. Griffis,* 964 S.W.2d 577, 588-89 (Tenn. Crim. App. 1997) (quoting *Sherrill v. State,* 204 Tenn. 427, 321 S.W.2d 811, 815 (Tenn. 1959), *overruled on other grounds by State v. Collier,* 411 S.W.3d 886 (Tenn. 2013)). In addition, our courts have stated that:

The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplice's testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question. *Id.* at 589 (footnotes omitted). Furthermore, we note that the question of whether an accomplice's testimony has been sufficiently corroborated is for the jury to determine. *See id.* at 588; *State v. Maddox,* 957 S.W.2d 547, 554 (Tenn. Crim. App. 1997).

A person is criminally responsible as a party to an offense "if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a).

A person is criminally responsible for an offense committed by the conduct of another, if . . .[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

Tenn. Code Ann. § 39-11-402(2). Criminal Responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn, Crim. App. 2003).

Under a criminal responsibility theory, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are

circumstances from which his or her participation in the crime may be inferred. *See State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). The defendant need not have taken a physical part in the crime in order to be held criminally responsible. *See id.* To be criminally responsible, the defendant must "in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)(citations omitted).

The jury found Defendant guilty of first degree murder in the perpetration of robbery. *See* Tenn.Code Ann. § 39-13-202(a)(2) (2012). Especially aggravated robbery, one of Defendant's conviction offenses, is defined as follows: robbery as defined in Tennessee Code Annotated section 39-13-401, where the robbery is accomplished with a deadly weapon *and* the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403. Robbery is defined in Tennessee Code Annotated section 39-13-401 as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."

Second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). It is also a "result-of-conduct offense," and "[t]he statute focuses purely on the result and punishes an actor who knowingly causes another's death." *State v. Ducker*, 27 S.W. 3d 889, 896 (Tenn. 2000). Thus, as pertinent here, a person acts "knowingly" with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id.* § 39-13-302(b).

This Court has held that the deliberate firing of shots at a person constitutes "knowing" conduct for the purpose of establishing second degree murder. *See State v. Rickie Reed*, No. W2001-02076-CCA-R3-CD, 2002 WL 31443196, at *5-6 (Tenn. Crim. App. Oct. 31, 2002)( "[A]ppellant deliberately shot into a moving vehicle with a high powered assault weapon, clearly aware that his actions could result in the death of an individual."); *State v. Kenneth Anthony Henderson*, No. M1999-00547-CCA-R3-CD, 2002 WL 537042, at *4 (Tenn. Crim. App. Apr. 11, 2002)(Evidence sufficient for second degree murder when Defendant and at least one other person fired multiple shots at two men in a parked car killing one of them.).

Viewing the evidence in a light most favorable to the State, it is undisputed that Defendant, Derrick Blair, Chris Estes, and Chris Cozart, who had earlier been consuming alcohol with some of them also smoking marijuana and using Xanax at Defendant's house, initially went to Eddie Good's house uninvited to a social gathering. The victim was inside the house at the time playing pool with some other guests. After Mr. Good asked everyone to leave the gathering, it is also undisputed that Defendant, Mr. Blair, Mr. Estes, and Mr. Cozart were leaving Mr. Good's house in Mr. Estes' truck when Mr. Estes wrecked his truck into some trees along Mr. Good's driveway. Because the truck was stuck, the men initially

attempted to pull the truck out of the trees with Mr. Good's smaller truck.  Mr. Estes and Mr. Cozart then left in Mr. Good's truck and intended to drive to Defendant's house to pick up Mr. Cozart's four-wheel drive vehicle; however, Mr. Estes also wrecked Mr. Good's truck and got it stuck on an embankment.

Both Mr. Blair and Defendant testified that while Mr. Estes and Mr. Cozart were gone, Mr. Good got angry because his truck had not been returned, and he threatened to kill them. Mr. Blair and Defendant both testified that they ran from the area and found Mr. Estes and Mr. Cozart in Mr. Cozart's truck.  The four men then returned to Mr. Good's residence and pulled Mr. Estes' truck out of the trees.  They drove back to Defendant's house in the two trucks and continued drinking alcohol and smoking marijuana.  Mr. Cozart then passed out on the couch.  Mr. Blair testified that Defendant later indicated that he wanted to return to Mr. Good's house to "kick his ass cause he was threatening to kill us."  In his statement to police, Defendant acknowledged that he returned to Mr. Good's house; however, he claimed that he returned to look for his cell phone and to retrieve pieces of Mr. Estes' truck.

Both Mr. Blair and Mr. Estes testified that Defendant got a .410 sawed-off shotgun and a .22 caliber pistol and placed them in his car.  He then drove Mr. Estes and Mr. Blair back to Mr. Good's house. Mr. Estes testified that both of the guns belonged to Defendant, and he had previously seen both of the weapons at Defendant's house.  Mr. Estes testified that he rode in the front passenger seat by Defendant and that Defendant had the shotgun "stuck in down between the seat in his car."  He said that Mr. Blair had the .22 caliber pistol in the back seat.  Mr. Estes testified that Mr. Blair told him that they were going back to Mr. Good's house to "rob them."  He said that when they arrived at Mr. Good's house, Defendant pulled around behind the house and parked the car approximately five to six feet from the house. Mr. Blair testified that Defendant got out of the car with the shotgun and fired a shot into the air while he was running toward the back door of Mr. Good's house.  He then reloaded the weapon. Mr. Blair testified that Mr. Estes was carrying the .22 pistol.  He said that Defendant ran inside the house, and Mr. Blair went to the back window.  Mr. Blair testified that Mr. Estes shot through the back door of the house twice and then handed the gun to Mr. Blair who shot through the window four times.  However, Mr. Estes denied ever firing the pistol.

Both Mr. Blair and Mr. Estes testified that Defendant ran into the pool room and fired a shot in the direction where the victim had been sleeping in a chair.  Defendant ran back out of the house, opened the screen door, pointed the gun inside, and fired another shot.  Mr. Estes testified that before Defendant fired the last shot, Mr. Estes saw the victim walk over to the door and look out, and "when he looked out he turned around and slid down the door there, and that's when [Defendant] opened the door and put the gun in there and leaned back out and pulled the trigger and shot."  Mr. Blair testified that the shot hit the victim. He then entered the room and saw the victim lying on the floor.  Mr. Blair admitted that he removed the

-27-

victim's wallet from the victim's pants ripping the pocket. Mr. Estes testified that he saw Mr. Blair leaning over the victim's body on the floor. After looking unsuccessfully for Mr. Good, the three men got back into Defendant's car. Mr. Blair testified that he looked through the victim's wallet and then handed it to Defendant and Mr. Estes. Mr. Blair testified that after they arrived back at Defendant's house, the victim's wallet was thrown into a fire. He did not know what happened to the money that he saw in the wallet. Mr. Estes testified that after they arrived back at Defendant's house, Defendant asked him to hand him the .22 pistol out of the car. He testified that he later heard Mr. Blair, who was in the next room with Defendant, ask "how much was it or something."

It is undisputed that Defendant, Mr. Estes, and Mr. Blair at some point drove to the location where Mr. Good's truck had been wrecked. They used Mr. Cozart's truck to pull the vehicle from the embankment and then tow it to Defendant's house. They used Mr. Cozart's truck to push the vehicle into a creek behind Defendant's house in order to conceal it. Mr. Blair and Mr. Estes testified that they returned a third time to Mr. Good's house with Defendant because Defendant said that they needed to find Mr. Good. They drove back to the house in Mr. Cozart's truck. Both Mr. Blair and Mr. Estes testified that Defendant again had the .410 shotgun, and Mr. Blair had the pistol. Mr. Estes testified that Defendant and Mr. Blair got out of the truck and ran toward the back door of the house. He heard "someone yell, saying, you all need to get out of here, get out of here, and I heard two sharp loud rifle shots, and three sharp pistol sounds and a .410 blast." Mr. Blair testified that as they were walking down the sidewalk at Mr. Good's house, "someone hollered from toward the bonfire, you know what happened, get the F out of here, and started shooting at us." Mr. Blair could not tell the person's identify but he fired back at the individual with the .22 pistol.

Mr. Good testified that he woke up by the bonfire with his rifle. He saw a truck drive up the driveway, turn around, and then stop. Mr. Good testified that three individuals got out of the vehicle and started walking. He said,

> One stopped right over there by my AC and started looking through the window. The other two went on the porch there. One of them started looking through the kitchen window and one looked through the - - or just looking through the door itself.

Mr. Good testified that he got his rifle and "hollered, hey, what are you doing, or something to that - - well, they started running, so I fired two rounds in the air." He noted that the smallest of the three individuals fired back at him. Mr. Good said that "it was a .22 because, you know, it didn't sound that loud."

Mr. Blair's and Mr. Estes' testimony was corroborated by evidence recovered at the crime scene, which included: spent .410 shotgun shells outside Mr. Good's pool room door, wadding from .410 shotgun shells inside the pool room, a seven-inch shot pellet pattern on a screen door leading into the pool room, a fired .410 shotgun shell wadding and blood on the chair located in the corner of the room, a fired .410 shotgun shell on Defendant's front sidewalk, two pieces of shotgun shell wadding in Defendant's front yard, two unfired .410 shotgun shells inside Defendant's residence under the couch, four .410 shotgun shell brass caps and three shotgun pellets in Defendant's fire pit. Special Agent Betts testified that the fired shotgun shell cases recovered from Mr. Good's backyard and from Defendant's residence were fired from the same shotgun and that all of the shot shells, wadding, and pellets were the same type and design and had the same loads.

At the crime scene, investigators discovered that the victim's pants pocket was ripped. Several pieces of partially burned paper were recovered from the fire pit at Defendant's house including the victim's voter registration card and a Delta Dental Insurance card bearing the victim's name. In addition, the victim's driver's license was found in the backseat floorboard of Defendant's car, and the victim's blood was on the steering wheel. Dr. Davis testified that the victim suffered one contact shotgun wound to his left ear, one close-range shotgun wound behind his left ear, and several shotgun pellet injuries to his upper left arm, left chest, and right hand.

Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant's convictions for first-degree felony murder, second-degree murder, and especially aggravated robbery. Furthermore, the testimony of Mr. Davis and Mr. Estes was sufficiently corroborated by the evidence presented at trial. Defendant is not entitled to relief on this issue.

Although the evidence is sufficient to support Defendant's convictions, we conclude that we must remand this matter to the trial court for entry of judgment forms which reflect that the second degree murder conviction and felony murder conviction merge into one felony murder conviction with an effective life sentence. "[W]hen only one person has been murdered, a jury verdict on guilt on more than one count of an indictment charging different means of committing . . . murder will support only one judgment of conviction for [the] murder." *State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998).

*Thirteenth Juror*

Defendant also contends that the trial judge who presided over his trial erred in performing his role as thirteenth juror by approving the verdicts.

Tennessee Rule of Criminal Procedure 33(d) imposes a mandatory duty on the trial judge to serve as the thirteenth juror in every criminal case. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). Rule 33(d) does not require the trial judge to make an explicit statement on the record. Instead, when the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict. *Id.* Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror, may an appellate court reverse the trial court's judgment. *Id.* Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If the reviewing court finds that the trial judge has failed to fulfill his or her role as thirteenth juror, the reviewing court must grant a new trial. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995).

In this case, Defendant does not assert that the trial court failed to perform its duty or that the trial court indicated any disagreement with the jury's verdicts. Rather, he contends that the jury's verdict is contrary to the weight of the evidence and that the trial court acting as the thirteenth juror should have granted his motion for a new trial.

The record reflects that the trial court stated in the record that "[s]itting by law in my capacity as the thirteenth juror in this case, I do concur in the jury's verdict and I do pronounce you, [the defendant], guilty of all three counts." In addition, the trial court specifically denied Defendant's motion for new trial concerning this issue. At the motion for new trial, the court noted that the jury had determined the credibility of the witnesses and gave the evidence the weight the jury thought it deserved after being instructed on the law. The trial court specifically said:

> [t]here's always conflicts in testimony. These conflicts must be resolved by the jury and in a manner that they think is appropriate, and that's what this jury did. So, this Court was not at that time thinking about overturning that verdict because I did agree to it, and I've gone back and reviewed it and I feel the same way I did the day the jury returned that verdict.

As previously held by this Court: "It is not our function to reweigh the evidence but merely to ensure that the trial court complied with its duty under Rule 33(d)." *State v. Ronald Dillman*, Jr., No. E2009-00648-CCA-R3-CD, 2010 WL 1854135, at *8 (Tenn. Crim. App. May 7, 2010) *perm. app. denied* (Tenn. Oct. 12, 2010). The trial court in this case complied with its duty under Rule 33(d). Defendant is not entitled to relief on this issue.

For the foregoing reasons, we vacate and remand for the verdict of second degree murder to be merged into the corrected judgment of first degree felony murder. In all other respects, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE